IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  11-cv-02973-JLK

MOE AMAN (f/k/a/ MOHAMMED AMAN),

Plaintiff,

v.

DILLON COMPANIES, INC. d/b/a/ KING SOOPERS A Kansas Corporation,

Defendant.

---

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Moe Aman ("Mr. Aman" or "Plaintiff") by and through his undersigned counsel, hereby files his Response to Defendant's Motion for Summary Judgment as follows:

## I.      INTRODUCTION

The voluminous factual record makes this case particularly unsuited for summary judgment. Defendant's forty-seven-page brief contains one-hundred-and-sixty-two (162) purportedly undisputed facts.  Plaintiff has responded by disputing nearly half of Defendant's facts and raising an additional one-hundred-and-sixty-seven (167) disputed facts.  Complicating the matter further, not only do the parties have disputes between themselves about material issues of fact but many of Defendant's key witnesses disagree about the events that occurred leading to Mr. Aman's termination and about the relevant policies and practices in place at the store where Mr. Aman worked.

As if that weren't enough, the manager at Store No. 5 where Mr. Aman worked, Jack Ruby ("Ruby"), and King Soopers' Labor Relations Manager, Stephanie Bouknight ("Bouknight"), resorted to finger pointing with Ruby claiming that Bouknight recommended terminating Mr. Aman and Bouknight claiming she had no involvement whatsoever in Mr. Aman's termination because he resigned.  Bouknight also claimed that after an injured employee reaches Maximum Medical Improvement ("MMI") King Soopers attempts to accommodate that individual's restrictions by keeping him in his current job.  Ruby countered by testifying that there was no discretion, once the employee reached MMI, he is reassigned to another position if he has restrictions.  Determining the credibility of these witnesses is not a matter that should be resolved on summary judgment.

In spite of the voluminous record, the facts are relatively straight-forward.   Plaintiff was born in Ethiopia and immigrated to America in 2000 as a teenager when he was fifteen years old. Speaking little to no English, he began working for King Soopers in November 2000.  He graduated from South High School in 2004.  He progressed through the system and eventually became a Produce Clerk.  He transferred to Store No. 5 in February 2006.  From the beginning he began having problems with the Produce Manager, Don Gordy ("Gordy") and the Assistant Produce Manager, Chris Bateson ("Bateson.)  Gordy called him an "African monkey" and Bateson called him a "lazy African."   Mr. Aman considered these comments to be racially derogatory and complained to Ruby.  Gordy also told another produce department employee who was White, Marcy Goldis ("Goldis"), that Gordy had told her that he did not like Black people. Goldis reported this to Ruby as well.  Mr. Aman also reported, at various times, that both Gordy and Bateson were taking actions against him because of his race.   Ruby took no action

whatsoever to remedy the situation.

Matters came to a head on March 7, 2007 when Gordy assaulted Mr. Aman by pushing a shopping cart into his midsection causing him to fall backwards onto Goldis. Both Mr. Aman and Goldis were injured. King Soopers called the police on Gordy who was issued a ticket for assault and later fired. Mr. Aman pressed charges against Gordy and was issued a Protective Order against him. Goldis also testified at Gordy's trial. Gordy was found guilty of assault. It was Gordy's assault that caused Mr. Aman's back injury and lifting restrictions that are at the heart of Mr. Aman's demotion and termination. After Gordy was fired Bateson became the Produce Manager who continued his discriminatory treatment towards Mr. Aman. Mr. Aman complained but Ruby still ignored those complaints at one time telling Mr. Aman that if he continued complaining he would be fired.

Mr. Aman continued working in the Produce Department and needed only minimal assistance because of his lifting restrictions. He reached MMI on October 11, 2007 and continued to work as a Produce Clerk for another seven months until May 11, 2008 when he was demoted to the service desk making less than half the pay he made as a Produce Clerk. In spite of the fact that a year had passed since the injury King Soopers now inexplicably claimed that it could no longer allow Mr. Aman to work in the Produce Department and he had to go to the Service Desk. On May 13, 2008 Mr. Aman sought treatment from his doctor, appropriately called in sick using King Soopers' call in procedures. The calls were documented on King Soopers records and on Mr. Aman's phone bills. Ultimately, Mr. Aman was fired on May 27, 2008 for being a no call/no show. This lawsuit resulted.

## II.     RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Admit.

2.     Admit.

3.     Admit.

4.     Admit.

5.     Admit.

6.     Admit.

7.     Admit.

8.     Admit.

9.     Denied.  Plaintiff testified that he does not recall receiving the manuals.  The only Sexual Harassment Training Acknowledgement form that Defendant questioned Mr. Aman about was dated 12/09/05.  (Ex. 1 at 158: 3 – 10; 175: 24 – 176: 7.) [1]

10.     Denied.  Mr. Aman was transferred to Store No. 5 effective February 12, 2006. (Ex. 1 at 140: 4 – 6; Deposition of Theresa Smith, hereinafter "Ex. 42" at 28: 9 19.)

11.     Admit.

12.     Admit.

13.     Admit.

14.     Admit.

15.     Denied in part.  Admit that employees who are going to miss a shift unexpectedly

---

[1] Defendant's exhibits are numbered from 1 – 41.  All references in this Response Brief to Exhibits 1 – 41 are taken from Defendant's Brief.  Plaintiff's exhibits begin with Exhibit 42.

are required to call two hours before the shift starts.  According to the policy cited, employees may call their "immediate supervisor **or another member of management**."  "Another member of management" is not limited to only the Assistant Store Manager or the Store Manager.  (Ex. 11 at KS 0730, Absence/Tardiness;  Ex.12, at KS 00547, Attendance.)

16.    Denied.  King Soopers' Personal Policies and Special Procedures does not limit calls to another supervisory employee in the store only "if the relevant managers are not present at the time the call has to be made."  The policy allows the employee to *initially* call his "immediate supervisor **or another member of management**."  (Ex. 11 at KS 0730, Absence/Tardiness; Ex. 12, at KS 00547, Attendance.)

17.    Denied.   King Soopers' Personal Policies and Special Procedures does not require the employee to speak  with his or her  "immediate supervisor, an Assistant Store Manager or the Store Manager" when he or she calls in.  Employees may initially speak with the immediate supervisor **or another member of management**."   Moreover, the policy does not require a second call-in if the employee speaks with another member of management. (Ex. 11 at KS 0730, Absence/Tardiness; Ex. 12, at KS 00547, Attendance.)

18.    Admit that calling in allows the store to schedule around absent employees.  Deny remainder.  The Collective Bargaining Agreement states that after three days of sick calls, you are required to bring in a doctor's note when you get back from you sick leave.  (Continuation of Deposition of Jack Ruby, hereinafter "Ex. 54" at 46: 3 – 18.)  A jury could infer that the sick calls were excused if the employee brought in a doctors note after returning from sick leave.

19.    Admit.

20.    Denied.  King Soopers policy does not limit approval to the "store manager" but

to "management." (Ex. 12 at 21 – 22.)

21.     Denied.  King Soopers' Personal Policies and Special Procedures does not require the employee to speak  with his or her  "immediate supervisor"  but the employee may contact the "immediate supervisor **or another member of management**."     (Ex. 11 at KS 0730, Absence/Tardiness; Ex. 12, at KS 00547, Attendance.)  Moreover, King Soopers' policy states, "Associates who are absent for three (3) or more workdays shall be required as a condition of applying for sick pay to submit medical certification of their absence as proscribed by King Soopers Sick Pay Administration." (Ex.  12 at 22, Sick Pay.)  (*See also*, ¶ 18 denial above.)

22.     Denied.  For the same reasons as denial of  ¶ 21 above.

23.     Denied.  When an employee is out on sick leave there is no requirement to submit a written request for a leave of absence but the employee submits a doctor's note upon his return. (Ex. 42 at 33: 18 – 35: 16.)

24.     Denied.  See ¶¶  20 – 23 above.  The parties dispute what the "policy" is.

25.     Denied.  No Call/No Show according to Store No. 5 manager, Ruby was "when [the employee is] on the schedule and there is no contact with the store saying that they are coming or not coming to work." (Ex. 5 at 56: 3-7.)  (*See also*, Ex. 9 at 73: 14 – 74: 16; Ex. 15 at 30: 13 – 20.)

26.     Admit.

27.     Admit.

28.     Admit that Bateson called Plaintiff  a "lazy African" but deny time frame because the effective date for Mr. Aman's transfer to Store No. 5 was February 12, 2006. (Ex. 42 at 28: 9 19.)

29.     Admit.

30.     Admit.

31.     Admit.

32.     Admit.

33.     Denied but not relevant.  The citation provided does not indicate that Bateson would be required to occupy all of those positions before becoming Store Manager.

34.     Admit.

35.     Denied.  The citation states, Mr. Aman asked for a union representative but Ruby "refused to bring the union up there and just dismissed – covered up everything. He said, he didn't mean it, just go."  The citation does not indicate that Mr. Aman refused to attend any meeting.  (Ex. 1 at 132: 23 – 133: 7.)

36.     Admit.

37.     Admit.

38.     Denied.  Ruby didn't say he was going to "transfer" Mr. Aman because of his racial complaints.  He said he was going to "fire" him.  (Ex. 1 at 186: 16 – 25.)

39.     Admit.

40.     Admit that Mr. Aman complained about race discrimination in scheduling.

41.     Admit.

42.     Admit.

43.     Admit.

44.     Admit that the union withdrew Mr. Aman's grievance but deny as to the reasons. The notations Defendant attaches at KS 1097 and 1098 are not appropriate for summary

judgment because they are hearsay and not sworn testimony.

45.     Admit.

46.     Admit that Gordy specifically called Mr. Aman an "African Monkey" he did not merely state the words to Mr. Aman.  (Ex. 1 at 142: 8 – 143: 14.)

47.     Admit.

48.     Admit.

49.     Admit.

50.     Admit.

51.     Admit.

52.     Admit.

53.     Admit

54.     Admit.

55.     Admit.

56.     Admit.

57.     Admit.

58.     Admit.

59.     Admit.

60.     Denied in part.   Admit that the job description stated lifting requirements in excess of 30 pounds.   However, in practice produce clerks were not required to lift more than 30 pounds if they felt that the items was too heavy for them to lift.   As part of King Soopers' safety program employees could use the "buddy lift" to lift items they feel are too heavy for them to lift.  (Ex. 5 at 27: 5 – 15.)  There are no weight requirements to use the buddy lift, but "just what

people think is comfortable that they can lift safely.  (Ex. 5 at 28: 2 – 6.)  The buddy lift allows

two people to lift heavier items.  If it took two people to lift something, the employees would use

the "buddy lift."  (Ex. 5 at 27: 8 – 12.)

61.     Denied.  Mr. Aman used select-a-shift to select cut fruit duties, which didn't

require lifting, when available according to his seniority.  (Ex. 1 at 201: 3 – 7.)  Other employees

in the produce department also selected "cut fruit" if it was available according to their seniority.

(Deposition of Goldis, hereinafter "Ex. 45" at 15: 3 – 23.)   At all other times Mr. Aman

performed the duties of the produce clerk position and occasionally used the "buddy lift" to lift

items he felt were too heavy.   (Declaration of Moe Aman, hereinafter "Ex. 44" at ¶ 14.)

According to the Assistant Produce Manager, Robbie Casados, Mr. Aman was doing the same

thing that any other produce clerk was doing.  (Casados Deposition, hereinafter "Ex. 46" at 11:

15 – 25.)  Goldis never had to lift anything for Mr. Aman.  (Ex. 15 at 18: 9 – 11.)

62.     Admit that Mr. Aman used select-a-shift to select cut fruit duties, which didn't

require lifting, when available according to his seniority.  (Ex. 1 at 201: 3 – 7.)   To the extent

Defendant is alleging that cut fruit duties required lifting that statement is denied.  (Ex. 1 at 201:

3 – 7.)

63.     Denied.  Whenever Mr. Aman worked cut fruit the duties lasted the entire shift.

(Ex. 44 ¶13.)

64.     Denied.  "Cut fruit doesn't require any lifting at all."  (Ex. 1 at 201: 3 – 7.)

65.     Admit.

66.     Admit.

67.     Admit.

68.    Admit.

69.    Admit.

70.    Admit.

71.    Denied.   The policy manual does not describe an assessment process "before MMI" and does not describe the criteria used to determine whether the employee is able to work after MMI.  (Ex. 12 at 30 – 31.)

72.    Denied.   This is the ultimate issue to be determined by the trier of fact.   The evidence shows that the assessment process was merely a sham.   Ruby testified that it is King Soopers' policy that once an employee reaches MMI and he couldn't perform all the duties of his job then he was reassigned.   There was no discretion to allow Mr. Aman to remain a produce clerk with a reasonable accommodation.  (Ex. 43 at 32:  19 – 33: 1.)

73.    Admit.

74.    Admit.

75.    Admit.

76.    Admit.

77.    Denied in part.   Mr. Aman's restrictions at the time he reached MMI permitted him to lift over thirty pounds "occasionally."  (Ex. 23.)

78.    Admit.

79.    Denied. Work at the service desk required lifting more than 30 pounds.  (Ex. 42 at 77: 18 – 78: 18; Ex. 47 at KS 0972.)

80.    Denied.  Work at the service desk required lifting more than 30 pounds.   (See ¶ 79 above.)

81.     Admit.

82.     Admit.

83.     Admit.

84.     Admit.

85.     Denied.  Bouknight and Ruby's credibility is at issue in this case.

86.     Denied.  Bouknight and Ruby's crecibility is at issue in this case.

87.     Denied.  Ruby told Mr. Aman that his only options were termination or work at the service desk.  (Ex. 1 at 194: 6 – 14.)

88.     Denied that the conversation took place on May 5, 2008.  Conversation took place a "day or so" after the initial meeting with Ms. Clarke  (Ex. 5 at 50: 3 – 52: 23.)

89.     Denied.  Ruby did not have a conversation about putting Mr. Aman on the service desk schedule with the service desk manager who made up the schedules until the week following his conversation with Mr. Aman about the assessment.  (Ex. 5 at 42: 3-43:11.)  Thus, Ruby  could not have reviewed Mr. Aman's schedule with him.

90.     Admit.

91.     Denied.    Mr. Aman presented medical documentation for the work-week beginning May 13, 2008.  (Ex. 36.)

92.     Admit.

93.     Admit.

94.      Denied.  Bouknight was aware of the complaint of May 5, 2008.  ( Ex. 6 at 101: 16 – 102: 6; Ex. 28.)   When Mr. Aman complained to Ruby, Ruby was required to report the complaint to Bouknight.  Bouknight and Ruby's credibility are at issue in this case.

95.     Admit.

96.     Admit that the union dropped the grievance but not relevant.  The remainder is denied because it is not sworn testimony and is hearsay as to why the union dropped the grievance, therefore inadmissible.

97.     Denied.  (Ex. 1 at 190: 21-23.) Mr. Aman denies that the demotion was unrelated to the allegations regarding his alleged failure to come to work.  The demotion, and the facts related to whether or not Mr. Aman's call ins were appropriate and his subsequent termination are all part of a continuing pattern of discriminatory and harassing behavior as alleged in Mr. Aman's complaint and one of the ultimate issues to be decided by the trier of fact.

98.     Admit.

99.     Admit but not relevant.  Mr. Aman was out sick as of May 16, 2008 and was fired before he returned to work.

100.    Admit as to the first part regarding the dates of May 13, 14, 15, 16 and 17.  Deny that Mr. Aman was scheduled for May 20, 21, 22 and 23.  Mr. Aman was removed from the daily schedule and not scheduled to work on those days.  (Deposition of Garlock, hereinafter "Ex. 48", at 96: 10 – 19; 99: 8 – 10; 100: 3 – 12; 101: 24 – 102: 4.)

101.    Admit that Mr. Aman did not come in to work on May 13, 14, 15, 16 and 17.  Deny that Mr. Aman was scheduled for May 20, 21, 22 and 23.  (See ¶ 100.)

102.    Denied.  This is not a statement of fact.

103.    Denied.  During the week of May 11, 2008 Mr. Aman spoke with Carlos to report his absence for May 13th, Vercury to report his absence for May 14th, Dave to report his absence on May 15th, Vercury on the 16th , Dave on the 17th and Hatchett on the 18th.  (Transcript of

Hearing, hereinafter, "Ex. 49" at 39: 4 – 41: 1.)  Dave Schooner is a night crew foreman, Vercure

Williams is the grocery manager and Carlos Hill is the head clerk.  (Ex. 5 at 123: 2 – 19.)

104.    Admit.

105.    Admit that Mr. Aman did not call Ruby directly but his calls were recorded on

King Soopers' daily schedule which constitute notice to Ruby.   (Ex. 8 at 28: 10 -8.)

106.    Denied.  On May 18, at 10:49 a.m. Mr. Aman called into the service desk after his

call earlier that morning to Hatchett.  (Ex. 32, pg. 6 of 6.)

107.    Denied.  See ¶ 103 above.

108.    Admit that Mr. Aman spoke to Hatchett on his first call only of May 18, 2008.

109.     Denied.  Mr. Aman told Hatchett that he would be out from the 18th through June

2.  (Ex. 13 at 37: 12 – 20.)

110.    Denied.  Hatchett actually told Mr. Aman that he ("Hatchett") had been informed

to tell Mr. Aman to bring in a doctors note when he returned.  (Ex. 49 at 36: 24 – 37: 13)

111.    Admit but not relevant.

112.    Admit but not relevant because the doctor's note provided the excuse.

113.    Denied.  Plaintiff called the store a second time on May 18, 2008 at 10:49 a.m.

(Ex. 1 at 243: 7 – 13; Ex. 32 at pg. 6 of 6.)

114.    Denied.  After Mr. Aman brought in his phone records showing that he had called

in the week of May 13, 2008 Ruby excused Mr. Aman's absences by no longer citing the week

of May 13, 2008 as reason for Mr. Aman's termination but then claiming that he made the

decision to terminate Mr. Aman for "three no calls, no shows" on "May 21[st], 22nd, and 23rd."

(Ex. 49 at 6: 26 - 7: 11.)

115.   Admit.

116.   Denied.  Plaintiff's phone records show all outgoing and incoming calls.  None of the incoming calls were from King Soopers or from any phone number unfamiliar to Mr. Aman. (Ex. 32; Ex. 44 ¶ 25.)

117.   Denied.  King Soopers did not send the letter of May 16, 2008 because Mr. Aman did not receive the letter of May 16, 2008 in the mail.  (Ex. 1 at 221: 9 – 227: 3.)

118.   Admit.

119.   Denied.  The letter was never sent.  (See ¶ 117 above.)

120.   Admit that Defendant has the discretion to terminate an employee who has been absent without leave for three days.  Deny that Quigley wanted to give Mr. Aman a chance to contact store management before being discharged because the letter was never sent.  (See ¶117 above.)

121.   Admit that Quigley made the statement.

122.   Denied.  Mr. Aman discussed a "paper" with the Xapray address.  He does not say that he received the letter of May 20, 2008 and specifically states that the letter was handed to him on June 2.  (*See also*, discussion of May 20, 2008 letter ¶ 117.)   (See also letter of May 20, 2008 with an address on Jewell Ave.  (Ex. 33.)

123.   Admit.

124.   Denied.  Mr. Aman did not receive Ex. 34 from the union by certified mail at the Xapray address as the letter indicates.  Moreover, this "statement" is not sworn testimony.  (Ex. 44 ¶ 31.)

125.   Admit that Ruby said he contacted the union.  Denied that Mr. Aman had not

contacted the union.  (Ex. 13 pg. 59: 17 – 27.)

126.    Denied.  Plaintiff's phone records show all outgoing and incoming calls.  None of the incoming calls were from King Soopers or from any phone number unfamiliar to Mr. Aman. (Ex. 32; Ex. 44 ¶ 25.)

127.    Denied.  Plaintiff's phone records show all outgoing and incoming calls.  None of the incoming calls were from King Soopers or from any phone number unfamiliar to Mr. Aman. (Ex. 32; Ex. 44 ¶ 25.)

128.    Denied.  The letter of May 27, 2008 was not addressed correctly and was returned to King Soopers as "undeliverable." (Ex. 43 at 34: 15 – 36: 17; Return Mail Envelope, hereinafter "Ex. 50.")

129.    Admit.

130.    Admit.

131.    Admit.

132.    Denied.  Mr. Aman saw Dr. Chevnova on May 13, 2008 and began receiving treatment.  (Ex. 49 at 41:  16 – 21; 45: 29 – 46: 14.)

133.    Denied upon review of earlier transcript of October 2008.  (See ¶ 132 above.)

134.    Denied.   (Ex. 1 at 234: 21.) (Ex. 36.)

135.     Admit that the note states "is off work since May 13, 2008".  However, the remainder of the note does not state as Defendant claims.

136.    Admit.

137.    Admit.

138.    Denied.  Exhibit 36 does not state that Mr. Aman could not perform "any" work.

139.    Admit to the extent "certification" is the same thing as Ex. 36.

140.    Admit.

141.    Denied.   On June 2, Ruby told Plaintiff that he was terminated for being a "no call, no show for five days" from May 13, 14, 15, 16 and 17.  (Ex. 49 at 35:  27 – 36: 10.)

142.    Denied.  Mr. Aman produced his phone records proving that he had called in sick those five days and that he was told to bring in a doctor's note when he returned.  (Ex. 49 at 36: 2 – 37: 9; Ex. 32.)

143.    Denied.  Hatchett, told Mr. Aman that he ("Hatchett") *had been informed to tell Mr. Aman* to bring in a doctors note when he returned.  (Ex. 49 at 36: 24 – 37: 13)

144.    Denied.  Ruby was aware that Mr. Aman had made calls that were recorded on the daily schedule and he knew that the head clerk could have written notations on the daily schedule about Mr. Aman's call ins but he did not ask them if they wrote the notations on the daily schedules.  At most, Ruby's "investigation" was merely a sham investigation.  (Ex. 5 at 157: 23; 158: 4.)

145.    Denied.  Mr. Aman never stated that he called in on May 20, 21 and 22 and on June 2, 2008 he told Ruby that he had been instructed to bring in a doctor's note on his return.  (Ex. 49 at 36: 24 – 37: 13)  A jury could infer that Ruby would not be inquiring into whether Mr. Aman had called in on May 20, 21 and 22 when Mr. Aman never claimed that he did.

146.    Admit that the daily schedule confirmed that Mr. Aman had called in.   Deny remainder.  (See ¶145 above.)

147.    Admit.

148.    Admit.

149. Admit that the notation on the calendar may be done in the manner described. Deny that it was the only method. The daily schedule is prepared by the head clerk who first reports to work in the morning. (Ex. 7 at 22: 6 – 12.) If an employee calls in prior to the arrival of the head clerk then the manager who takes the call will verbally notify the head clerk or supervisor of the call. (Ex. 7 at 24: 5 – 13.)

150. Admit.

151. Admit.

152. Denied. Hatchett stated that he never had any conversations with Ruby or Quigley about Mr. Aman calling in. (Deposition of Hatchett, hereinafter "Ex. 51" at 18: 2 – 10.)

153. Admit.

154. Admit.

155. Denied. Mr. Aman gave Ruby all the names of the individuals he spoke with. (See ¶ 103 above.)

156. Denied. Carlos Hill is a head clerk. (Ex. 5 at 123: 2 – 19.)

157. Denied to the extent that Defendant claims Mr. Aman's absence was under the Leave of Absence Policy as opposed to sick leave. It is the practice at Store No. 5 that when an employee calls saying that they are going to be out for the next week, the person taking the call asks the employee to bring in a doctor's note on the employee's next scheduled shift. (Ex. 9 at 91: 4 – 19.)

158. Denied. (See ¶ 103.) Plaintiff conferred with Ruby on June 2, 2008 and brought in his doctor's note. (Ex. 5 at 124: 11 – 13.)

159. Denied. Mr. Aman called in about the second week of his absence on May 18,

2008.  (See ¶ 103.)

160.   Admit.

161.   Admit.

162.   Denied.   Mr. Aman contacted the union regarding his discharge "in a timely manner" on June 2, 2008.  (Ex. 13 at 59: 17 – 27.)

### III.   STATEMENT OF ADDITIONAL DISPUTED FACTS
### (HEREINAFTER "SADF")

**A.    MR. AMAN'S ASSAULT BY HIS SUPERVISOR, DON GORDY.**

1.    Mr. Aman was transferred to Store No. 5 effective February 12, 2006.  (Ex. 42 at 28: 9 19.)

2.    Gordy told Goldis that he (Gordy) did not like Black people.  Goldis told Ruby. (Deposition of Goldis, attached hereto as "Ex. 45" at 22: 3 – 7.)

3.    At the time Gordy made the statement about he didn't like black people, Mr. Aman was the only black person in the produce section.  (Ex. 45 at 23: 18 – 23.)

4.    Gordy confronted Mr. Aman in the cooler at King Soopers, placed both hands on a cart, pushed it into Mr. Aman, which pushed it into Goldis.  (Ex. 45 at 19: 16 – 25; Gordy Discharge, "Ex. 53".)

5.    Gordy attacked Mr. Aman in the produce cooler injuring Mr. Aman and Ms. Goldis.  (Ex. 45 at 18: 16 – 19; Ex. 53.)

6.    Goldis did not have any dispute with Gordy and based on her observations believed that Gordy's actions were directed towards Mr. Aman. (Ex. 45 at 21: 4 – 15.)

7.    Mr. Aman told the assistant store manager, Smith, that he had been assaulted. Goldis was crying.  (Ex. 42 at 37: 1 – 4.)

8.      King Soopers security called the police as a result of Gordy pushing the cart into Mr. Aman.  (Ex. 42 at 37: 1 – 14; Ex. 45 at 19: 11 – 25.)

9.      Goldis characterized the incident to the police as an "assault."  (Ex. 45 at 45: 18 – 25.)

10.     The police issued Gordy a ticket for assault.   (Ex. 42 at 42: 9 – 11; Ex. 45 at 46: 21 – 24.)

11.     Gordy was charged with assault and Goldis went to Denver County Court to testify about what happened.  (Ex. 45 at 45: 1 – 14; 46: 25 – 47: 5.)

12.     Gordy was found guilty of assault.  (Ex. 44 ¶ 10.)

13.     As a result of the incident a protective order was issued against Gordy.  (Ex. 44 at 9; Protective Order, "Ex. 52".)

14.     After Mr. Aman left there were no other black people that came into the produce department.  (Ex. 45 at 38: 22 – 24.)

15.     As a result of the assault Mr. Aman was injured and left with permanent lifting restrictions.  (Ex. 44  ¶ 12.)

## B.      LIFTING RESTRICTIONS IN THE PRODUCE CLERK POSITION.

16.     Mr. Aman could perform all of the duties of the produce clerk with an accommodation.  (Ex. 43 at 32: 8 – 18.)

17.     There were only two things in the produce department that Mr. Aman could not lift, potatoes and bananas, "other than that, everything was under 30 pounds."  (Ex. 49 at 48: 29 – 49: 10.)

18.     King Soopers started a new program in produce called "Cut Fruit."  Employees

chosen to perform cut fruit get trained on food safety and proper procedures for handling cut-fruit.  (Ex. 9 at 30: 17 – 31: 14.)

19.     There is a procedural guide that identifies the job requirements of the cut-fruit position.  (Ex. 42 at 79: 15 – 18.)

20.     Store No. 5 was allocated 56 hours for cut-fruit.  (Ex. 42 at 33: 3 – 4.)

21.     Procedurally there was a difference in the produce clerk job and the cut-fruit position because cut-fruit did not require lifting.  (Ex. 42 at 78: 19 – 24.)

22.     Mr. Aman used select-a-shift to select cut fruit duties, which didn't require lifting, when available according to his seniority.  (Ex. 1 at 201: 3 – 7.)  Other employees in the produce department also selected "cut fruit" if it was available according to their seniority.  (Ex. 45 at 15: 3 – 23.)  At all other times Mr. Aman performed the duties of the produce clerk position and occasionally used the "buddy lift" to lift items he felt were too heavy.  (Ex. 44 ¶ 14.)  After reaching MMI I was able to perform all of the duties of the produce clerk.  (ex. 44 ¶ 14.)

23.     As part of King Soopers safety program employees could use the "buddy lift" to lift items they feel are too heavy for them to lift.  (Ex. 5 at 27: 5 – 15.)

24.     There are no weight requirements to use the buddy lift, but "just what people think is comfortable that they can lift safely.  (Ex. 5 at 28: 2 – 6.)

25.     The buddy lift allows two people to lift heavier items.  (Ex. 5 at 27: 8 – 12.)

26.     If it took two people to lift something, the employees would use the "buddy lift."  (Ex. 5 at 27: 8 – 12.)

27.     Produce employees go through training on the buddy lift. (Ex. 5 at 27: 21 – 25.)

28.     Mr. Aman's co-workers were not required to lift things for him.  (Ex. 15 18: 9 -

11.)

29.     Casados was the assistant manager of the produce department from November 2007 through September 2008.  (Ex. 46 at 5: 24 – 6: 9.)

30.     Casados never had any problems with Mr. Aman's work and had no knowledge of any other work problems specific to Mr. Aman.   (Ex. 46 at 8: 10 - 9: 5.)

31.     Casados had no knowledge that Mr. Aman had lifting restrictions and to his knowledge, no one was assisting Mr. Aman with any of the work he was doing.  (Ex. 46 at 10: 16 – 23.)

32.     Casados never had any conversations with Ruby or the produce manager about Mr.  Aman having work restrictions.  (Ex. 46 at 11: 15 – 18.)

33.     Casados observed Mr. Aman doing the same things that any other produce clerk was doing.  (Ex. 46 at 11: 19 – 21.)

34.     Casados never heard any complaints by anyone in the produce department that they had any problems or issues with Mr. Aman or complaints that they were doing Mr. Aman's work.  (Ex. 46 at 11: 22 – 25.)

35.     After Mr. Aman reached maximum medical improvement he continued to work in the produce department.  (Ex. 43 at 29: 19 – 25.)

36.     Ruby never discussed the possibility of Mr. Aman continuing in the produce department with the accommodation previously provided.  (Ex. 43 at 33: 24 – 34: 5.)

37.     It was never an option to allow Mr. Aman to continuing working in produce even with an accommodation.  If the employee cannot perform all the duties of the classification then the employee can no longer stay in that department "even with an accommodation."  (Ex. 43 at

33: 24 – 34: 22.)

38.     It's common to assess permanent restrictions as of the date of MMI.  (Ex. 49 at 27: 16 – 28: 6.)

## C.     MR. AMAN'S DEMOTION.

39.     Placing Mr. Aman in the service desk was the only option considered.  (Ex. 5 at 38:  9 – 16.)

40.     Mr. Aman was paid $16.26 per hour as a produce clerk and would have been paid $8.09 at the service desk.  (Deposition of Bouknight, attached hereto as "Ex. 55" at 134: 13 – 135: 11; Personnel Action, "Ex. 56".)

41.     The effective date for Mr. Aman's demotion was May 11, 2008.  (Ex. 42 at 113: 9 – 14;  Ex. 56.)

42.     If one position has a 30 pound lifting restriction it would not be appropriate to place an individual with a 30 pound lifting restriction in another position with a 30 pound lifting restriction.  (Ex. 26 at 29: 9 – 13.)

43.     The job description for the service desk is the GG clerk.  (Ex. 7 at 32: 23 – 33: 2; Ex. 47.)

44.     Employees at the service desk are required to lift over 30 pounds.  (Ex. 42 at 80: 2 – 10; Ex. 43: at 36: 18 – 37: 7; Ex. 47.)

45.     Employees at the Service Desk with weight restrictions could get another employee to assist them when they needed to lift something in excess of their weight restriction. (Ex. 7 at 37: 10 – 38: 2.)

46.     King Soopers would have allowed someone to help Mr. Aman at the service desk

to accommodate his restrictions the same as what they did to accommodate his restrictions in the produce department.  (Ex. 43 at 37: 4 – 18; Ex. 43 at 70: 21 – 23.)

**47.**     According to the union rules, an employee is allowed 18 months leave of absence to improve and King Soopers cannot demote an employee prior to that time.  (Ex. 49 at 44: 12 – 17; 48: 20 – 23.)

**D.     MR. AMAN'S CALL INS TO REPORT HIS ABSENCE.**

48.     Employees calling in to sick were to call in 2 hours before their shift to "the management personnel that was on duty."  (Ex. 15 at 30:  3 – 11.)

49.     At nights, the "management person" is the night crew foreman or grocery manger.  (Ex. 54 at 5: 21 – 24.)

50.     The practice at King Soopers was that an employee was not required to contact their direct supervisor if they were going to be absent, they could do so but they weren't required.  (Ex.51 at 26: 17 – 22.)

51.     In the past when Mr. Aman was ill he was not required to call his immediate supervisor or the store manager, not required to call them on their cell phone or at their house.  He was only required to speak to the immediate esuperviosr available at the store, leave a message that they would sent to Ruby.  (Ex. 1 at 239: 13 – 241: 10.)

52.     Mr. Aman would specifically ask for a supervisor with their "red tag."  (Ex. 1 at 241: 15 – 17.)

53.     There is no written policy requiring an employee to make a second phone call to his or her department head once they have called in to a management person.  (Ex. 8 at 23: 23 – 24: 4.)

54.     The Service Desk at Store No. 5 was open from 6 or 7:00 a.m. until 10:00 p.m. (Ex. 7 at 16: 8 – 18.)

55.     A person scheduled to work at 6:00 a.m. is required to call in prior to 4:00 a.m. (Ex. 7 at 28: 10 – 13.)

56.     Head clerks, store managers, assistant store managers and the service desk manager are not typically in the store at 4:00 a.m.  (Ex. 7 at 28: 14 – 22.)

57.     At 4:00 a.m. the grocery manager and night crew foreman are typically at Store No. 5.  (Ex. 7 at 28: 23 – 25.)

58.     It is not uncommon for employees to call in at 3:00 a.m., so long as they call in two hours before their shift.  (Ex. 54 at 13: 17 – 14: 8.)

59.     There was nothing problematic about Mr. Aman calling in during the very early morning hours so long as it was two hours prior to his shift.  (Ex. 54 at 14: 9 – 17.)

60.     There were four head clerks at Store No. 5.  (Ex. 48 at 11: 17 – 20.)

61.     Dave Schooner is a night crew foreman, Vercur[y] Williams is the grocery manager and Carlos Hill is a head clerk.  (Ex. 5 at 123: 2 – 19.)

62.     Phil Hatchett was a night crew foreman and was an appropriate person to talk to if an employee was calling in sick.  (Ex. 42 at 35:  8 – 16.)

63.     Hatchett received a lot of sick calls and would write it down on the daily that they would not be in.  (Ex. 51 at 8: 2 – 16.)

64.     When Mr. Aman called he asked to speak to "any head clerk who was available at the time."  (Ex. 49 at 39: 22 – 26.)

65.     The head clerk on duty supervises service desk people.  (Ex. 48 at 12: 7 – 10.)

66.     Vercure [Williams], the grocery manager was also one of Mr. Aman's immediate supervisors..  (Ex. 5 at 103: 25 – 104: 4.)

67.     Mr. Aman spoke with Carlos [Hill] to report his absence for May 13th, Vercury [Williams] to report his absence for May 14th, Dave [Schooner] to report his absence on May 15th, Vercury [Williams] on the 16th , Dave [Schooner] on the 17th and Phil Hatchett on the 18th. (Ex. 49 at 39: 4 – 41: 1.)

68.     Management told employees that Mr. Aman had called in and they were going to have to replace the shift.  (Ex. 45 at 32: 16 – 25.)

69.     Hatchett told Ruby that Mr. Aman had called in for a full week on May 17, 2008. (Ex. 43 at 118: 5 – 25.)

70.     Quigley was aware that Mr. Aman had called Hatchett.  (Ex. 8 at 39: 14 – 16.)

71.     It was the duty of the individual taking the call to inform the employee's manager of the absence, for example, the produce manager or service desk manager.  (Ex. 9 at 84: 3 – 6.)

72.     When employees call in sick, managers are instructed to make a notation in the message portion of the dailes so that the department head is aware of the call.  (Ex. 49 at 19: 24 – 28.)

73.     When an employee calls in to management the management employee has a duty to inform Ruby or Quigley.  (Ex. 8 at 28: 3 – 18.)

74.     A notation on the daily is considered informing Ruby or Quigley that the employee has called in.  (Ex. 8 at 28: 10 – 18.)

75.     Hatchett claimed that neither Ruby nor Quigley ever talked with him about Mr. Aman calling in.  (Ex. 51 at 10:  11 – 16.)

76. It is the practice at Store No. 5 that when an employee calls saying that they are going to be out for the next week, the person taking the call asks the employee to bring in a doctor's note on the employee's next scheduled shift. (Ex. 9 at 91: 4 – 19.)

77. It is consistent with King Soopers' policy to be told to bring in a doctor's note. (Ex. 54 at 12: 16 – 23.)

78. After three days of calling in sick, the department head, the store administrative assistant or an available "management person" may appropriately tell the employee to bring in a doctor's note when they return. (Ex. 54 at 3: 17 – 5: 20.)

79. The Collective Bargaining Agreement states that after three days of sick calls, you are required to bring in a doctor's note when you get back from you sick leave. (Ex. 54 at 46: 3 – 18.)

**E.      NO CALL NO SHOW.**

80. A no call/no show is when an employee is "on the schedule and there is no contact with the store saying that they are coming or not coming to work." (Ex. 5 at 56: 3 – 7.)

81. A call like Mr. Aman' s sick calls that were written on the daily are not considered a no call/no show. (Ex. 51 at 13: 23 – 14: 3.)

82. Calling the night foreman is not considered a no call/no show. (Ex. 5 at 56: 17 – 25.)

83. A call in to the night foreman is appropriate for an employee to report a sick call. (Ex. 5 at 170: 25 -  171: 10.)

84. When an employee is a no call/no show the practice at Store No. 5 is first talk to the person on their next scheduled day. (Ex. 5 at 74: 14 – 16.)

85.     Had Ruby or Quigley looked at the daily schedule where it says "Moe called in sick, called in all week" he would not have been considered a no call/no show on the 14th and 16th.  (Ex. 43 at 80: 1 – 16.)

86.     Mr. Aman was not a no call/no show on May 13, 15, and 17th.  (Ex. 43 at 73: 23 – 75: 25.)

87.     King Soopers uses progressive discipline for no calls/no shows, one day suspension for the first no call/no show, then three days for the second and then termination for the third day.  (Ex. 5 at 112: 25 – 113:  8; Ex. 42 at 102: 3 – 103: 10; Ex. 48 at 63: 6 – 9.)

88.     If a no call/no show goes more than three or four days employees are sent a letter to invite the employee to contact the store.  (Ex. 9 at 75: 8 – 23.)

89.     Garlock claimed that Mr. Aman did not call in the first day he was scheduled to work at the service desk.  (Ex. 7 at 40: 19 – 23.)

90.     For the week ending May 17, 2008 Ruby accused Mr. Aman of being on the schedule for five shifts then calling "in sick one day or two days and then the other days not show up at all" even though he was aware that Mr. Aman had called in every day for the week ending May 17, 2008.  (Ex. 5 at 55: 11 – 17; Ex. 49 at 8: 25 – 9: 3.)

91.     The night crew foreman, Hatchett, told Mr. Aman that he ("Hatchett") had been informed to tell Mr. Aman to bring in a doctors note when he returned.  (Ex. 49 at 36: 24 – 37: 13; Ex. 1 at 227: 18 – 15.)

92.     Mr. Aman told Hatchett that he would come in on June 2, 2008.  (Ex. 49 at 37: 10 – 20.)

93.     Ruby claimed that the last time King Soopers heard from Mr. Aman was when he

talked to Carlos.  (Ex. 5 at 127: 7 – 14.)

**F.     THE CALLS REFLECTED ON THE DAILES AND MR. AMAN'S REMOVAL FROM THE DAILY SCHEDULE AFTER MAY 20, 2008.**

94.     The daily schedule is usually prepared by the opening front-end manager.  (Ex. 9 at 81: 1 – 5; Ex. 48 at 85: 12 – 13.)

95.     Employee names on the daily schedule are taken from the posted schedule.  (Ex. 5 at 58: 19 – 59: 7; Ex. 42 at 98: 3.)

96.     Employees who report that they are going to be absent ahead of time may still be reflected as scheduled on the posted schedule but removed from the daily schedule.  (Ex. 43 at 63: 4 – 24.)

97.     The dailes are filled out daily and used by King Soopers to show "what front-end employees are scheduled."  They are used to "assign people breaks, lunches, tardies, make notations of sick calls or any documentation that management would write on."  (Ex. 49 at 12: 10 – 22.)

98.     When employees called in sick it was the practice at Store No. 5 to write the information on the daily schedule.  (Ex. 5 at 57: 1 – 58: 5.) (Ex. 9 at 82: 10 – 83: 2.) (Ex. 8 at 53: 5 – 18.)

99.     The dailies had notations specifically showing that "Moe" Mr. Aman called in on May 13, 15, and 17th and also a notation on the 17th showing that he "called in all week."  (Ex. 16; Bottom of each page, messages section.)

100.     The notations on the daily were enough to let Ruby know that Mr. Aman had called in.  (Ex. 5 at 155: 21 – 156: 4.)

101.     The head clerks could have written the notations on the dailes that Mr. Aman

called in sick.  Ruby never found out one way or the other.  (Ex. 5 at 156: 17 – 158: 4.)

102.    Mr. Aman's name was no longer reflected on the daily schedule after May 20, 2008.  (Ex. 48 at 96: 10 – 15.)

103.    "Dina" would have excluded Mr. Aman from the daily on May 20 and 21st.  (Ex. 48 at 99: 14  - 20.)

104.    "Izza" would have excluded Mr. Aman from the daily on May 23, 2008.  (Ex. 48 at 102: 2 – 18.)

**G.      THE LETTER OF MAY 20, 2008.**

105.    It was pretty standard and consistent with King Soopers' practices to send letters like the letter of May 20, 2008 by certified mail.  (Ex. 54 at 32: 24 – 34: 14; 38: 12 – 19; Ex. 48 at 85: 12 – 13.)

106.    King Soopers' records reflected that Mr. Aman's address was the address in his personnel file on Jewel Avenue.  (Ex. 43 at 67:  1 – 13. )

107.    King Soopers used an address on Xapray Street to attempt to send correspondence to Mr. Aman.  (Ex. 43 at 64: 8 – 65: 17.)

108.    Ruby told Garlock that he was going to have a letter like the letter of May 20, 2008 sent out to Mr. Aman by certified mail.  (Ex. 48 at 57: 16 – 58: 19.)

109.    Ruby never saw a certified mail receipt for any letter going to Mr. Aman.  (Ex. 54 at 46: 19 – 47: 14.)

110.    Ruby had no explanation as to why the letter of May 20, 2008 was not sent by certified mail as was King Soopers' practice.  (Ex. 54 at 46: 19 – 47: 14.)

111.    Mr. Aman did not receive the letter of May 20, 2008.  (Ex. 1 at 71: 3-11.)

112.    When Mr. Aman transferred to Store No. 5 he gave the clerk there his address. (Ex. 1 at 71: 12 – 72: 1.)

113.    The five days referenced in the letter of May 20, 2008 were May 13, 14, 15, 16 and 17.  (Ex. 5 at 73: 13 – 21.)

114.    At the time the May 20, 2008 letter was sent, Ruby accused Mr. Aman of being a no call/ no show.  (Ex. 5 at 73: 5 – 9.)

115.    Ruby knew that Mr. Aman had called in prior to May 20, 2008.  (Ex. 5 at 76: 13 – 24.)

116.    Mr. Aman was not listed on the daily schedule after May 20, 2008.  (Ex. 43 at 115:  12 – 16.) (Ex. 5 at 92: 25 – 93: 5.)

## H.    KING SOOPERS NEVER TRIED TO CALL MR. AMAN.

117.    It was the practice at Store No. 5 to find out what was going on before terminating someone.  (Ex. 9 at 76: 10 – 13.)

118.    Ruby told Garlock that he tried to call Mr. Aman.  (Ex. 7 at 21:  22 – 23.)

119.     After Ruby told Garlock that he would continue to try to get a hold of Mr. Aman, Garlock had no more knowledge or involvement in Mr. Aman's situation.  (Ex. 48 at 49: 2 – 16.)

120.    Quigley does not recall one way or the other if he called Mr. Aman in May 2008. (Deposition of Quigley, attached hereto as "Ex. 57" at 71: 12 – 21.)

121.    Garlock never tried to call Mr. Aman.  (Ex. 7 at 41: 12 – 14.)

122.    Garlock claimed that he instructed Tracy to call Mr. Aman.  (Ex. 7 at 40: 19 – 23.)

123.    Tracy never actually made a call to Mr. Aman's phone number and at no time did

Garlock ever attempt to contact Mr. Aman.  (Ex. 48 at 45: 6 – 16.)

124.    Mr. Aman had previously provided King Soopers with his phone number as reflected on his phone records.  King Soopers had used that number to call him in the past.  (Ex. 44 ¶ 26.)

125.    There were no incoming calls from King Soopers on Mr. Aman's phone records. (Ex. 5 at 89: 15 – 21.)

## I.     MR. AMAN'S TERMINATION.

126.    Prior to sending out the letter of May 27, 2008 Bouknight made the suggestion to terminate Mr. Aman.  (Ex. 43 at 138: 1 – 16.)

127.    The letter of May 27, 2008 terminating Mr. Aman was not sent by certified mail and was returned to King Soopers as "undeliverable."  The address did not include a zip code. (Ex. 54 at 34: 15 – 36: 17; Ex. 50.)

128.    On June 2, 2008 Ruby told Mr. Aman that he was terminated for being a no call/no show for five days from May 13th through May 17th.  (Ex. 49 at 35: 10 – 36: 10; 51: 24 – 26.)

129.    Employees can speak with Ruby when they return to work the next day after calling in sick to get the leave approved.  (Ex. 5 at 101: 20 – 23.)

130.    Mr. Aman's absences would have been excused once he contacted Ruby to say that he contacted someone and said he was sick and provided documentation of that.  (Ex. 5 at 164: 14 – 165: 1.)

131.    After an employee reaches MMI his medical expenses are no longer paid for and after reaching MMI Mr. Aman was required to see his private physician and was required to pay

for the cost himself.  (Ex. 49 at 46: 3 – 9.)

132.    Mr. Aman saw Dr. Chevnova on May 13, 2008 and began receiving treatment. Mr. Aman also saw Dr. Chevnova on June 2, 2008.  (Ex. 36.) (Ex. 49 at 41:  16 – 21; 45: 29 – 46: 14.)

133.    Mr. Aman brought Ruby a doctor's note on June 2 when he came back.  (Ex. 5 at 124: 11 – 13.)

134.    On June 7, 2008 Mr. Aman brought his phone records into Ruby for Ruby to look over to show that Mr. Aman had called in to the store.  (Ex. 43 at 120: 13 - 121: 4.)

135.    When Mr. Aman brought in his phone records he showed Ruby that he had called in to the store every day that he was scheduled for the week beginning May 11, 2008.  (Ex. 5 at 122: 2 – 15.)

136.    Ruby's notes taken on June 7, 2008 reflect that Mr. Aman told Ruby that he spoke to Carlos, Dave, Vercure and Hatchett.  (Ex. 43 at 120: 13 – 121:4; Ex. 39.)

137.    Even though Mr. Aman had identified individuals he spoke with when he called in, Ruby claims his decision to terminate Mr. Aman was because he didn't know whom he talked to on specific days.  (Ex. 5 at 153: 17 – 154: 23.)

138.    After receiving confirmation that Mr. Aman had called in Ruby changed his reason for terminating Mr. Aman, now claiming that he made the decision to terminate Mr. Aman for "three no calls, no shows" on "May 21st, 22nd, and 23rd."  (Ex. 49 at 6: 26 - 7: 11.) (Ex. 5 at 158: 5 –159: 18.)

139.    Mr. Aman's name did not appear on the daily schedule as working on May 21st 22nd or 23rd.  (Ex. 16.)

140.     At the time Mr. Aman was terminated he had approximately 180 hours of accrued sick leave and three weeks of vacation.  (Ex. 1 at 207: 1-10.)

## J.     LATER COMPLAINTS OF HARASSMENT AND DISCRIMINATION.

141.     The effective date of Mr. Aman's demotion was May 13, 2008.  (Ex. 1 at 218: 5-12.)

142.     When Bateson called Mr. Aman a "lazy African" Mr. Aman complained to Ruby and Ruby didn't do anything.  The next day Bateson tried to have the assistant write Mr. Aman up.  (Ex. 1 at 144: 23 – 145: 10.)

143.     Ruby refused to investigate Mr. Aman's complaints.   (Ex. 1 at 148: 12-14.)

144.     In April 2008 Mr. Aman asked Ruby to sign his transfer request.  (Ex. 1 at 162: 2 – 6.) (Ex. 44 ¶ 7.)

145.     In response, Ruby told Mr. Aman that he was tired of him and he was going to get rid of him.  (Ex. 1 at 165: 11 – 166: 10.)

146.     Ruby threatened to get rid of Mr. Aman multiple times.  (Ex. 1 at 170: 4 – 21.)

147.     Mr. Aman's testimony at his unemployment hearing was under oath.  (Ex. 1 at 19: 15 – 20.)

148.     Clarke gave Mr. Aman the option to take a leave of absence for six months to get treatment and because he had reached maximum medical improvement, the company would not pay for it.  (Ex. 1 at 204: 1-7.)

149.     Complaints of discrimination or harassment may be made to individuals other than those identified by name in the policies.  (Ex. 6 at 50: 15 – 19.)

150.     On or about May 5, 2008 Mr. Aman complained to Clarke about on-going

harassment and discrimination.  (Ex. 28.) (Ex. 44 ¶17.)

151.   On May 5, 2008 Clarke sent an e-mail to Bouknight informing her of Mr. Aman's complaints of harassment and discrimination.  (Ex. 28.)

152.   Bouknight told Ruby about Mr. Aman's complaints of harassment and discrimination in conjunction with the letter to Mr. Aman of May 16, 2008.  (Ex. 6 at 101: 16 – 102:  6.)

153.   Bouknight's conversation with Ruby about Mr. Aman's complaints of harassment or discrimination occurred before Mr. Aman was terminated.  (Ex. 6 at 103: 2 – 104: 5.)

154.   On or about May 5 – 7, 2008 Mr. Aman also requested an accommodation of Ruby and Clarke that he continue to be allowed to work in his position as produce clerk as he had done since reaching MMI on October 11, 2008 or that he be allowed a medical leave of absence.  Mr. Aman complained to Clarke and Ruby about the failure to accommodate.  (Ex. 44 at 21.)

155.   Ruby recalls Mr. Aman coming to talk to him approximately 12 times.  (Ex. 5 at 17: 3 – 20.)

**K.     MR. AMAN'S REPLACEMENTS.**

156.   After Mr. Aman left the produce department and the service desk, the jobs were still required.  (Ex. 54 at 40: 3 – 12; 52: 20 – 53: 8.)

157.   After Mr. Aman left the produce department King Soopers transferred Mac McDowell and Jan Ontiveros into produce. Neither was Black.  (Ex. 46 at 13: 5 – 14: 6.)

158.   Robert Collins was the first person hired on at the service desk after Mr. Aman was terminated.  Collins is white.  (Ex. 48 at 115: 10 – 19.)

## L.      COMPARATORS WERE TREATED MORE FAVORABLY THAN MR. AMAN.

159.    Eric Gonzales, who is Hispanic, was a no call/no show more than one time.  (Ex. 42 at 98: 12 – 99: 15.)  His personnel files show no discipline for a no call/no show.

160.    An employee's prior attendance record factors in on disciplinary decisions. Consistent attendance problems warrants more sever discipline.  (Ex. 54 at 12: 25 – 13: 16.)

161.    Glenna Brooks, who still works at King Soopers and is white, has a history of excessive absenteeism/tardiness going back for over 10 years as follows:

   a.      7/16/95 – Written warning for missing 10 days in past 3 months.

   b.      3/07/99 – Written warning for missing 10 days since start of year.

   c.      10/10/99 – Written warning for 10 more sick calls since 3/7/99.

   d.      6/25/00 – Written warning for 23 more days of excessive absence.

   e.      04/15/06 – Written warning for being late.

   f.      10/04/06 – Excessive absenteeism behavior notice for sick call.

   g.      04/17/11 – Written warning for excessive absenteeism.

   h.      08/31/11 – 1 day suspension for calling in sick 4 days.

   i.      06/09/12 – Written warning for sick call.

(Ex. 54 at 19: 2 – 26: 7.)

162.    Terry Herrod, who is white and still works at King Soopers, Herrod had an unexcused absence on July 15, 2008.

   a.      On March 16, 2012 Ruby gave Herrod a written warning for excessive absenteeism/tardiness.   Herrod had "**15 sick calls since Sept 2011 and 83 lates since September.**"

b.      As of May 8, 2012, Mr. Herrod had been absent without leave for five days and had not called in during those five days.

c.      On May 14, 2012, King Soopers sent Herrod a letter by certified mail asking him to contact Ruby no later than three days from the date of the letter.

e.      A copy of the certified mail receipt was included in Herrod's personnel file.

g.      Ruby sent the letter by certified mail to make sure that Herrod received it and that it was delivered to the address that was on file.

f.      When Ruby spoke with Herrod, Herrod told him that he had not called in because "he thought he was on vacation."

g.      Herrod had no documentation showing that he had made a vacation request.

h.      Ruby excused Herrod's five days of no calls/no shows.

(Ex. 54 at 28: 19 – 34:14.)

## M.      PRIOR CONDUCT AND OFFENSIVE USE OF COLLATERAL ESTOPPEL.

163.    Bouknight attended the trial of *Julie Jacobson v. King Soopers*, 10-cv-01944-LTB-BNB.  (Ex. 55 at 19: 15 – 23.)

164.    On or about May 5, 2012 the jury reached a verdict against King Soopers.  (Ex. 58.)

165.    The jury found that King Soopers did not make a good faith effort to adopt and enforce policies and procedures to prevent violations of the ADA .  (Ex. 58, question 8.)

166.    The policies that were in force during the time period of the Jacobsen case were

the same policies that were in force in 2008.  (Ex. 55 at 19: – 21: 18.)

167.    In another ADA case, Scavetta v. Dillon Companies, d/b/a/ King Soopers, Inc., 10-cv-02986, Bouknight threatened to terminate an employee who requested an ADA accommodation stating "If she really wants to force the issue it won't take long before we reach termination."  (10-cv-02986-WJM-KLM, Doc. 58-6, pg. 1, attached hereto as "Ex. 59")

## IV.    LEGAL AUTHORITY AND ARGUMENT.

## A.    GENERAL LEGAL STANDARDS ON SUMMARY JUDGMENT.

On a motion for summary judgment, the moving party bears the burden of demonstrating no genuine issue of material fact exists. *Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008.)  Where, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by demonstrating a lack of evidence for an essential element of the nonmovant's claim. *Id.*  In deciding whether the moving party has carried its burden, the court does not weigh the evidence and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Id.*  If this burden is satisfied, the burden shifts to the nonmovant to show the existence of a genuine dispute of a material fact. The nonmoving party must go beyond the facts in its pleading and provide "specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) . A fact is genuine if it could lead the trier of fact to find in favor of the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.1997).

As discussed herein, the evidence in this case is disputed in numerous material respects and with respect to all twelve of Plaintiff's claims against Defendant.  Based on all of the facts

set forth above, with particular attention to the myriad factual disputes – and particularly when viewed in a light most favorable to Plaintiff, it is clear that genuine issues of material fact exists that necessitate a trial on the merits.  Defendant's Motion must therefore be denied.

## B.  PLAINTIFF HAS ESTABLISHED A GENUINE ISSUE OF MATERIAL FACT IN SUPPORT OF HIS DEMOTION CLAIMS.

Title VII, 42 U.S.C. § 1981 and the Americans with Disabilities Act all prohibit employers from discriminating against employees and from retaliating against them for opposing any practice made unlawful by the applicable statute.  Discrimination and retaliation, under all three statutes, is subject to the burden-shifting analyses of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-04, 36 L. Ed.2d 688, 93 S. Ct. 1817 (1973)  *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir. 2000) (analyzing Title VII retaliation claim under the burden-shifting framework delineated in McDonnell Douglas); *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987 (10th Cir. 2011) (analyzing 42 U.S.C. §1981 retaliation claim under the burden-shifting framework delineated in McDonnell Douglas); *EEOC v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011) (analyzing ADA retaliation claim under the burden-shifting framework delineated in McDonnell Douglas.

Under that framework, the plaintiff must first establish a *prima facie* case.  Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse actions(s).  *Pastran* at 1205; *Twigg* at 998; *C.R. England* at 1051.  If the employer meets that burden the plaintiff must then establish that the employer's proffered reason(s) are merely a pretext for unlawful discrimination.  *Pastran* at 1205; *Twigg* at 998; *C.R. England* at 1051.

Plaintiff's third and fourth claims for relief are based on his demotion in violation of Title

VII and 42 U.S.C. §1981. Plaintiff's sixth claim for relief is based on a violation of the ADA stemming from his demotion. Disputed issues of fact preclude summary judgment on all claims.

      1.        <u>Plaintiff's ADA and Title VII Demotion Claims are Not Time Barred</u>.

In *Zipes v. Trans World Airlines, Inc*. 455 U.S. 385, (1982) the Supreme Court held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Id*. at 393. The 10th Circuit had been "careful to distinguish . . . between a failure to timely file an administrative charge, which is not jurisdictional, and a failure to file an administrative charge at all, which is a jurisdictional bar." *Sizova v. Nat'l. Institute of Standards & Technology*, 282, F.3d 1320, 1325, (10th Cir. 2002.) King Soopers does not dispute that Mr. Aman's EEOC Charge includes allegations about his demotion. Rather, King Soopers argues that the demotion claim was not timely filed with the EEOC. Accordingly, this is a non-jurisdictional issue that is subject to wavier, estoppel, and equitable tolling. Here, Defendant has waived its statute of limitations defense.

When an employer responds to the merits of the charge without raising the issue before the EEOC, "it has waived its right to assert that defense in later federal court proceedings." *Buck v. Hampton Township School Dist.,* 452 F.3d 256, 258 (3rd Cir. 2006.) In *Buck* the court held that the verification requirement of the Charge was "analogous" to the time limit for filing charges with the EEOC and that, "[w]hen an employer files a response on the merits, he forgoes the protection that the requirement affords." Id. at 262. The purpose of the 300-day filing requirement is to prevent the "pressing of stale claims." *Zipes* at 394. In this case, King Soopers' responded by submitting a Position Statement that specifically addressed Mr. Aman's

demotion stating:

> Charging Party claimed that his back was injured as a result of the incident with Gordy in May 2007.  He later presented permanent restrictions and was determined by his physician to have reached maximum medical improvement. These permanent restrictions included no lifting of more than 30 pounds, and limitations on repetitive lifting, carrying, pushing, and pulling.
>
> King Soopers met with Charging Party to discuss these restrictions and to assess his ability to perform the essential functions of the produce clerk position. This assessment revealed that Charging Party was unable to perform the essential functions of a produce clerk, but was able to perform the essential functions of the Service Desk Position.  As a result, Charging Party was reassigned to the Service Desk.

(King Soopers' Position Statement, attached hereto as "Ex. 60" at pg. 3.)

A copy of the letter demoting Mr. Aman was also attached as an exhibit to the Position Statement.  Based on Mr. Aman's charges and King Soopers' response the EEOC issued a Determination finding that King Soopers had violated the ADA in that "Respondent denied CP's requests for reasonable accommodation, removed the reasonable accommodation he had been working under, and discharged him because of his disability and in retaliation for having requested a reasonable accommodation."  (EEOC Determination, attached hereto as "Ex. 61".) Accordingly, not only did Mr. Aman include the demotion claim in his EEOC charge but King Soopers responded to that charge and the EEOC issued a Determination in Mr. Aman's favor on this issue.  King Soopers has waived any argument that the statute of limitations has expired.

2.  <u>There are Disputed Issues of Fact that Preclude Summary Judgment on Mr. Aman's ADA Claim</u>.

To establish a *prima facie* case of disability discrimination a plaintiff must show that (1) he is disabled within the meaning of the ADA; (2) he is qualified for his employment position; and (3) the defendant discriminated against him because of his disability.  *Doebele v. Sprint*, 342

F.3d 1117, 1129 (10th Cir. 2003.)  In turn, the ADA defines disability as (A) a physical or mental impairment  that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. *Doebele* at 1129 – 1130.

In this case, Mr. Aman is not relying on an actual disability to support his ADA claim but that King Soopers regarded him as disabled.  As to that claim, King Soopers argues that "it relied on the medical report Plaintiff obtained in his workers' compensation proceeding, stating that Plaintiff had reached MMI."  (Brief, pg. 26.)  However, there are disputed issues of fact as to whether King Soopers actually relied on Plaintiff's "medical reports" or was just giving "lip service" to past medical records to cover up discriminatory animus.  "An employer's disregard for or disinterest in medical judgments regarding an employee's condition may support [an inference] that an employment action was impermissibly based on myths or stereotypes associated with disabilities. *Jones v. UPS* 502 F.3d 1176, 1190 (10th Cir. 2007.)

In this case, Mr. Aman reached MMI on October 11, 2007.  King Soopers demoted him seven months later on May 11, 2008.  Had King Soopers honestly and in good faith been relying on Mr. Aman's medical report King Soopers would have demoted him when he reached MMI on October 11, 2007.   Instead, King Soopers disregarded that report and waited seven months to demote Mr. Aman.  A jury could infer that temporal proximity between the time that Mr. Aman reached MMI and his demotion is too remote to establish that King Soopers relied on the medical report in demoting Mr. Aman.  *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177,1181-82 (10th Cir. 2006) (nine months too temporally remote to support inference of causation); *Haynes v. Level 3 Comm'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (employee could not show

temporal proximity where seven months intervened between protected activity and retaliatory conduct); *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (time period between two to three months not sufficient alone to establish causation in Title VII failure-to-hire case); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (three-month period, standing alone, insufficient to establish causation).

King Soopers also argues that it relied on the IME performed in March 2008 in making its demotion decision.  (Brief, pg. 26.)  In doing so, King Soopers states that "reassigning Plaintiff to the service desk – was effectively Bouknight's decision."  (Brief, pg. 28.)  However, Bouknight testified differently stating it was Ms. Clarke that made the decision to reclassify Mr. Aman to the service desk.  (Ex. 55 at 70: 1- 22.)  She also testified that "I wasn't involved in Mr. Aman's assessment, I wasn't involved in Mr. Aman's termination."  (Ex. 55 at 95: 9 – 11.) Bouknight further testified that even when she was copied on documents pertaining to Mr. Aman's assessment they were put in an assessment file and she did not read them.  When asked whether she had a duty to look at documents about Mr. Aman that were sent to her, Ms. Bouknight responded "no."  (Ex. 55 at 90: 13 – 94: 1.)  In addition, Ms. Bouknight also testified that she never called Ruby in conjunction with Mr. Aman's assessment or demotion because it was "not [her] job to call Jack Ruby."  (Ex. 55 at 108: 20 – 111: 8.)  Finally, Ms. Bouknight attempts to distance herself from the decision to demote Mr. Aman even further stating that she was not involved in any requests by Mr. Aman for an accommodation; it was part of Ms. Clarke's responsibility to find Mr. Aman a job "when she was doing the assessment process" and neither Clarke nor Ruby ever spoke with her about an accommodation  (Ex. 55 at 127: 25–19; 135: 5 – 14.)

In short, King Soopers seems to be pointing the finger at Ms. Bouknight as the individual responsible for the decision demoting Mr. Aman but Ms. Bouknight states otherwise. In any event, there are disputed issues of fact about who made the decision to demote Mr. Aman and King Soopers has presented absolutely no evidence that Bouknight, if she was the decision maker, was aware of the March IME. Nor has there been any evidence that Ruby or Clarke were aware of the March 2008 IME. Based on Ms. Bouknight's conflicting testimony, the credibility of the witnesses will be key in deciding the facts. From these facts a jury could infer that King Soopers did not rely on any medical records, including the March 2008 IME, in demoting Mr. Aman and that it regarded Mr. Aman as disabled.

As to King Soopers' contention that Mr. Aman was unable to perform the essential duties of the job with to without reasonable accommodation, he had performed the job for over one year after his injury and seven months after reaching MMI! Moreover, there are disputed facts about whether employees in the Produce Department were actually required to lift more than 30 pounds. One of King Soopers' safety protocols was the "buddy lift" which allowed employees to assist each other with lifting heavier items. There were no weight restrictions in order to seek assistance. (SADF ¶ 22-24.) Thus, all employees could seek assistance with lifting items over 30 pounds (or any weight) in spite of the lifting requirements identified on the job description. When available, Mr. Aman also selected "cut-fruit" duties as a produce clerk which required no lifting at all. (SADF ¶ 22.) In addition, Mr. Aman's 30-pound lifting restriction was not absolute. His medical records stated that his restriction was "occasional."

After October 11, 2007, when Mr. Aman was not working the cut fruit section, he performed all of the duties of the Produce Clerk and was able to do so without an

accommodation.  In fact, Casados was the Assistant Manager for the Produce Department from November 2007 through September 2008 and had no knowledge that Mr. Aman had lifting restrictions and to his knowledge, no one was assisting Mr. Aman with any of the work he was doing.  (SADF ¶ 29-30.)  Casados never had any conversations with Ruby or the produce manager about Mr.  Aman having work restrictions and observed Mr. Aman doing the same things that any other produce clerk was doing.  (SADF ¶ 31.)  Further, Casados never heard any complaints by anyone in the produce department that they had any problems or issues with Mr. Aman or complaints that they were doing Mr. Aman's work.  (SADF ¶ 31-36.)

Finally, Ruby testified that it is King Soopers' policy that once an employee reaches MMI and he couldn't perform all the duties of his job then he was reassigned.  There was no discretion to allow Mr. Aman to remain a produce clerk even with a reasonable accommodation. (SADF, ¶ 36-37.)  From Ruby's testimony a jury could infer that the employee's medical reports had no significance whatsoever.  This testimony flies in the face of Bouknight's testimony that when an assessment is done King Soopers asks the employee 'if there is any type of accommodation that they're aware of that could be provided to them that would allow them to remain in there position.  (Ex. 6 at 23: 19 – 24: 4.)  This evidence is more than sufficient to establish a material fact regarding whether King Soopers actually relied on Mr. Aman's medical reports.

There is ample evidence in the record from which a jury could infer that King Soopers regarded Mr. Aman as disabled as there is no causal connection between the October 11, 2007 medical certification and his demotion seven months later.  Moreover, the person King Soopers identifies as the individual responsible for the decision says she had nothing to do with it.

Further, there is no evidence that  anyone at King Soopers had knowledge of the IME.  Finally, Mr. Aman had been performing the produce clerk duties since his injury a year earlier and for seven months after reaching MMI he performed the job with no accommodation.  Accordingly, Mr. Aman was able to perform the essential duties of the produce clerk position with and without a reasonable accommodation.

3.   There are Disputed Issues of Fact that Preclude Summary Judgment on Mr. Aman's Retaliation Claims.

A plaintiff's burden of establishing a *prime facie* case for retaliation is low.  *Garrett v. Hewlett-Packard Co*., 305 F.3d 1210, 1221 (10th Cir. 2002.)  The plaintiff can do so by showing that: (1) he "engaged in protected opposition to discrimination"; (2) he suffered adverse employment action; and (3) "a causal connection exists between the protected activity and the adverse action.  *Perry v. Woodward*, 199 F.3d 11261141 (10th Cir. 199.)

"Protected opposition can range from filing formal charges to voicing informal complaints to superiors."  *Fye v. Oklahoma Corp. Commission*, 516 F.3d 1217, 1218 (10th Cir. 2008) *citing*, *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004.)  "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the [the statute]."  *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1202-1203 (10th Cir. 2008.)  Moreover, "[a] plaintiff need not convince the jury that his employer had actually discriminated against him; he need only show that when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory.")  *Hertz* at 1015, *Crumpacker v. Kansas Dep't of Human Res.*, 338 F.3d 1163, 1172 (10th Cir. 2003.)

In arguing that Mr. Aman did not engage in protected activity Defendant takes all of the evidence in the light most favorable to itself – the exact opposite of what is required by summary judgment.  For example, Defendant states that Plaintiff engaged in no protected activity before his reassignment to the service desk. (Brief pg. 28.)  However, in his Amended Complaint Mr. Aman states that he complained about race discrimination in April 2008.[2]  (Amended Complaint ¶ 42.)  That complaint was protected activity.  Mr. Aman complained to Ruby that Bateson would change his hours after he selected them using select a shift and give them to an employee with less seniority, Eric Gonzales.  Mr. Gonzales is Hispanic.  Mr. Aman told Ruby, as he had in the past, that Bateson was discriminating against him because of his race.   Mr. Aman would consistently select those shifts that allowed him to work the most hours available to him.   In many cases, Gonzales, who had less seniority, had more hours than Mr. Aman.  When Mr. Aman would select a particular shift that allowed him more hours, on many occasions Bateson would switch the schedule he selected allowing Gonzales to work more hours.  (Ex. 44 ¶ 15 – 16.)

Defendant characterizes Mr. Aman's racial complaint as "mis-remembered or false

---

[2] Throughout Mr. Aman's deposition King Soopers' attorney never asked Mr. Aman about complaints in 2008 but made obvious attempts to prevent Mr. Aman from testifying about his complaints.  At one point early in the deposition Mr. Aman asked for clarification about a question and Mr. Deeny refused to clarify his question, stating, "I don't really have any need to continue this dialogue with you."  (Ex. 1 at 90: 9 – 91: 10.)  Another time when Mr. Aman was responding to a question regarding evidence of race discrimination, Mr. Deeney interrupted him and would not let him complete his answer.  When it was pointed out that Mr. Aman wasn't done with his answer Mr. Denney responded, "He was as far as I'm concerned.  He came to a period."  (Ex. 1 at 129:  1 – 130: 5.) On another occasion when Mr. Aman was responding to questions about Mr. Ruby's conduct Mr. Deeney would not let Mr. Aman respond stating "You're done with the answer to my question."  (Ex. 1 at 173: 1 – 12.)  On yet another occasion when Mr. Aman was asked about facts related to race discrimination he told Mr. Deeney that he wasn't done with his response, Mr. Deeney told him, "I am.  Yeah you are. .  I'm not going to sit here and listen to you."  (Ex. 1 at 192: 3 -  193: 25.)

conclusions regarding schedules" and asks this court to infer that Mr. Aman's complaints were not protected activity because "the Union confirmed that the schedules were appropriate by withdrawing Plaintiff's grievance over his schedule." (Brief pg. 29.) However, there is no sworn testimony about what the Union confirmed. Even if there were, that fact is not dispositive. Mr. Aman has ample evidence that Gonzales, who was less senior, worked more hours than he. For example, in 2007 Mr. Aman worked 1,256.3 hours with 4.8 hours of overtime. (Ex. 62.) Mr. Gonzales worked 1,563.2 hours with 45.9 hours of overtime. Ex. 63.)[3] During January and February 2008 that trend continued with Mr. Aman working 209.4 hours with no overtime and Mr. Gonzales working 256.4 hours with 5.4 hours of overtime. (Ex. 64; 65.) In March, 2008 Mr. Gonzales was on vacation but by April 2008 Mr. Aman worked 147.2 hours with .3 hours of overtime and Mr. Gonzales worked 156.1 hours with 7.5 hours of overtime. (Ex. 64; 65.)

The reasonable good-faith belief standard "empowers employees to report what they reasonably believe is discriminatory conduct without fear of reprisal, " *Bd. of Cnty. Comm'rs*, 405 F.3d at 852, and does not require that the plaintiff "convince the jury that his employer . . . actually discriminated against him, " *Hertz*, 370 F.3d at 1015-16; see also *Crumpacker*, 338 F.3d at 1171 n.5 (10th Cir. 2003). Mr. Aman's beliefs about his co-worker, Eric Gonzales, receiving more hours with less seniority is supported by King Soopers' own records. Under any standard a jury could infer that Mr. Aman had a reasonable good faith belief that his complaint was protected activity.

As to King Soopers' contention that a complaint about being called an "African Monkey"

---

[3] Even when considering the time off that Mr. Aman took after the assault, Gonzales still worked considerably more hours than Mr. Aman.

or "lazy African" is not protected activity it's hard to imagine what type of racial slur King Soopers would consider as protected activity. This raises serious issues about King Soopers policies, procedures, training and overall adherence to Title VII and other laws protecting employees from discriminatory conduct.  If an employee can't report that he has been called an "African Monkey" or a "lazy African" without fear of reprisal because it is not protected activity, then King Soopers does nothing more than promote a culture reminiscence of pre-civil rights legislation enacted to prohibit such conduct. Perhaps King Soopers' management and its counsel should review King Soopers' policies that provide examples of prohibited conduct to include "verbal of  physical conduct that (1) denigrates or shows hostility or aversion toward an individual because of his/her race. . . *making derogatory ethnic or racial statements*."  (Ex. 66, KS 00774-775.)  On this basis alone, summary judgment should be denied.

As to King Soopers' contention that Mr. Aman has no evidence raising a reasonable inference of a causal connection between any protected activity and *Bouknight's decision*.  As previously discussed, Bouknight said it wasn't her decision.  However, King Soopers does tie Ruby to the decision stating he was "involved in the decision to reassign Plaintiff to the service desk position." (Motion, pg. 24.)  Defendant's self serving statement attempting to insulate itself by claiming that only Bouknight made the decision is contrary to its statement indicating that Ruby was also involved in the decision.    The credibility of these witnesses is inherently suspect. As this court has previously held, "these questions are appropriately determined not by a trial judge on summary judgment, but by a jury whose primary function is to make determinations about people's conduct based on subjective standards." *Ziegler v. Inabata of America, Inc.*, 316 F.Supp.2d 908, 914-915 (D. Colo. 2004).  Because Mr. Aman complained to Ruby in April 2008

and Ruby was "involved" in the decision demoting him, viewed in the light most favorable to Mr. Aman and drawing all inferences in his favor a jury could find a causal connection.[4]  Finally, temporal proximity is also in Mr. Aman's favor.  His was demoted less than one month after his complaint to Ruby in April 2008.   *See, Ramirez v. Oklahoma Dep't. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (concluding that a one and one-half month period between protected activity and adverse action may establish causation); *see also, Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (assuming that temporal proximity of two months and one week is sufficient to support a prima facie case of retaliation).

4.   Evidence of Pretext.

In addition to the evidence of pretext in Section C.4 below, as it specfically relates to the demotion, the following evidence is more than sufficient to establish pretext:

- The job Mr. Aman was transferred into at the service desk also had a 30-pound lifting requirement.

- Mr. Aman had been performing the Produce Clerk position for over a year after the injury.

- Mr. Aman had reached MMI on October 7, 2011.

- Other employees could use the "buddy lift" if they wanted help lifting heavier items.

- Mr. Aman was entitled to a leave of absence pursuant to union rules.

- Bouknight testified that King Soopers attempts to accommodate an

---

[4] King Soopers' policies also require that discrimination and harassment complaints be reported to Bouknight.  Thus, Ruby had a duty to report this conduct.  It is up to a jury to decide whether he did.

individual's restrictions by keeping him in his current job.  Ruby countered by testifying that there was no discretion, once the employee reached MMI, he is reassigned to another position if he has restrictions. Employees at the Service Desk with weight restrictions could get another employee to assist them when they needed to lift something in excess of their weight restriction. (SADF ¶ 23-27.)

- King Soopers would have allowed someone to help Mr. Aman at the service desk to accommodate his restrictions the same as what they did to accommodate his restrictions in the produce department.  (SADF ¶ 46.)

- According to the union rules, an employee is allowed 18 months leave of absence to improve and King Soopers cannot demote an employee prior to that time.  (SADF ¶ 47.)

- Under King Soopers' practices, if one position has a 30 pound lifting restriction it would not be appropriate to place an individual with a 30 pound lifting restriction in another position with a 30 pound lifting restriction.  (SADF ¶ 42.)

- The Assistant Manager of the Produce Department reported that Mr. Aman was doing the same job responsibilities as any other produce clerk and he was not aware that Mr. Aman had any lifting restrictions.  (SADF ¶ 29-34.)

- It was never an option to allow Mr. Aman to continuing working in produce even with an accommodation.  If the employee cannot perform all the duties of the classification then the employee can no longer stay in that department "even with an accommodation."  (SADF ¶ 37.)

5.      Failure to Accommodate.

For all of the reasons set forth above, King Soopers failed to accommodate Mr. Aman. There are disputed issues of fact about whether Mr. Aman remaining in his Produce Clerk position was a reasonable accommodation. Drawing all inferences in Mr. Aman's favor a jury could infer that leaving Mr. Aman in the Produce Clerk position did not present an undue hardship for King Soopers. *Smith v. Midland Brake*, 180 F.3d 1154, ("the ADA defines the term "discriminate" to include not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.")

## C. PLAINTIFF HAS ESTABLISHED A GENUINE ISSUE OF MATERIAL FACT IN SUPPORT OF HIS DISCHARGE CLAIMS.

Plaintiff's first and second claims for relief are for racial discrimination in violation of Title VII and 42 U.S.C. § 1981. His fifth claim for relief is for discrimination in violation of the Americans with Disabilities Act. His seventh and eighth claims for relief are for retaliation in violation of Title VII and 42 U.S.C. § 1981 and his eleventh claim for relief is for retaliation in violation of the Americans with Disabilities Act. Mr. Aman can establish a *prima facie* case on all of his discharge claims.

### 1. Plaintiff Can Establish a *Prima Facie* Case of Race Discrimination Under Title VII, § 1981 (First and Second Claims for Relief).

Although Defendant does not dispute that Plaintiff can establish a *prima facie* case of race discrimination under Title VII or § 1981, those elements are easily met. A plaintiff may establish a *prima facie* case of wrongful termination by showing that: (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was

discharged; and (4) the job was not eliminated after her discharge. *Perry v. Woodward*, 199 F.3d 1126, 1139 - 1140 (10th Cir. 1999).  Plaintiff can establish the elements of *a prima facie* case as follows:  (1)  Plaintiff is Ethiopian, Black; (2) Mr. Aman had performed the duties of the Produce Clerk since 2006 and King Soopers deemed him qualified for the Service Desk position when he was transferred into that position; (3) Mr. Aman was discharged from both positions; (4)  After Mr. Aman left both positions the job was not eliminated and Mr. Aman was replaced in both positions.  (SADF, ¶ 156-158.)

      2.     Plaintiff Can Establish a *Prima Facie* Case of Discrimination Under the ADA (Fifth Claim for Relief).

Plaintiff incorporates herein his argument on the ADA with respect to Mr. Aman's demotion claim.   Relying on *Robertson v. Las Animas Cnty, Sheriff's Dept.*, 500 F.3d 1185 (10th Cir. 2007) King Soopers also argues that Mr. Aman has no *prima facie* case for failure to accommodate because "Plaintiff did not require an accommodation to perform the essential functions of the service desk position" and "Plaintiff did not request or identify any required reasonable accommodation before his discharge."  (Brief pg. 34.)  King Soopers' argument raises more issues of disputed facts and inconsistencies that caution against granting summary judgment.  The job description at the service desk also had lifting requirements that were over thirty pounds.  (SADF, ¶ 44.)  A jury could infer that King Soopers argument that Mr. Aman did not require an accommodation in the service desk position but did require an accommodating in the produce clerk position when both positions had lifting requirements over 30 pounds is further evidence of pretext.

3.   Plaintiff Can Establish a *Prima Facie* Case for Retaliation Under Title VII, § 1981 and the ADA. (Seventh, Eight and Eleventh Claims for Relief).

A plaintiff's burden of establishing a *prima facie* case for retaliation is low.  *Garrett v. Hewlett – Packard Co.*, 305 F.3d 1210, 12210 (10th Cir. 2002.   The plaintiff can do so by showing that (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.  *Pastran* at 1205; *Twigg* at 998; *C.R. England* at 1051.   The plaintiff need not prove a *prima facie* case by a preponderance of the evidence at the summary judgment stage.  *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 731 (9th Cir. 1986).   Under this standard, Plaintiff has clearly established a *prima facie* case for all of his retaliation claims.

Defendant does not argue that Mr. Aman's May 5, 2008 complaint to Clarke was not protected opposition.   "Protected opposition can range from filing formal charges to voicing informal complaints to superiors." *Fye v. Oklahoma Corp. Commission*, 516 F.3d 1217, 1218 (10th Cir. 2008) citing, *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir.2004).   Rather, Defendant only argues that Mr. Aman cannot establish a *prima facie* case of retaliation under Title VII or § 1981 because "Plaintiff complained to Clarke on May 5, 2008, about allegedly being harassed and discriminated over the eight years of his employment with King Soopers. There is no evidence that Ruby, the decision-maker for Plaintiff's discharge, knew about this complaint."  (Def.'s Brief pg. 34 – 35.)

However, Bouknight's testimony contradicts this assertion.   Clarke sent the May 5, 2008 e-mail documenting Mr. Aman's complaint to Bouknight informing her of Mr. Aman's complaints of harassment and discrimination.   (SADF, ¶ 151; Ex. 28.)   Bouknight told Ruby

about Mr. Aman's complaints of harassment and discrimination in conjunction with the letter she

wrote to Mr. Aman on May 16, 2008.  (SADF, ¶ 152.)  Bouknight testified that she was "*sure*

[she] talked to Jack Ruby" about the letter of May 16, 2008 asking Mr. Aman about his

complaints of harassment and discrimination. (Ex. 6 at 101: 16 - 102: 6.)   Bouknight's

conversation with Ruby occurred before Mr. Aman was terminated.  (SADF, ¶ 153.)  Moreover,

Mr. Aman also complained about race discrimination directly to Ruby in April 2008.  *See*, § B, 3

above. Accordingly, there is ample evidence in the record showing that Ruby was aware of Mr.

Aman's protected activity.

　　As to the remaining elements of the *prima facie* case, although Defendant does not

challenge those elements they are easily met.   Mr. Aman's demotion and termination are

obviously "materially adverse."   This leaves the Court to consider whether a reasonable jury

could find a causal connection between Bouknight's disclosure of Plaintiff's complaints to Ruby

and Plaintiff's complaints directly to Ruby in April 2008 and Mr. Aman's ultimate termination

on May 27, 2008.  "The date of Plaintiff's termination is key to this inquiry because the closer it

occurred to the protected activity, the more likely it will support a showing of causation."

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)  (assuming that temporal

proximity of two months and one week is sufficient to support a prima facie case of retaliation)

(emphasis added).   Moreover, the 10th Circuit has held that **a one and one-half month period**

**between protected activity and adverse action may, by itself, establish causation**." *Ramirez*

*v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994), *overruled in part on*

*other grounds*, *Ellis v. University of Kansas Med. Ctr.*, 163 F.3d 1186, 1194-98 (10th Cir. 1999).

Therefore, the extremely close temporal proximity alone (less than one month) is sufficient to

allow a reasonable jury to infer that Mr. Aman's termination was in retaliation to his protected opposition to discrimination in violation of Title VII and § 1981.

Defendant does not contest that Mr. Aman can establish a *prima facie* case on his ADA retaliation claim. Even if it had, those elements are easily met. *EEOC v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011.) Mr. Aman engaged in protected opposition and requested an accommodation during the May 5 – May 7 time frame.[5] The termination and demotion were materially adverse. As discussed above, there is a causal connection between the protected activity and the termination with close temporal proximity of only twenty days. Accordingly, Plaintiff has established a *prima facie* case and satisfied his initial burden under the *McDonnell Douglas* framework on his seventh, eight and eleventh claims for relief.

### 4. There Are Disputed Issues of Fact Regarding Defendant's Stated Reason for Terminating Mr. Aman That Preclude Summary Judgment.

Once an employee establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the termination. *Martin v. Nannie and the New Borns, Inc.* 3 F.3d 1410, 1417 (10th Cir. 1993). Under *Reeves* and *St. Mary's Honor Center,* if the jury disbelieves Defendant's stated reasons, that disbelief together with evidence supporting a *prima facie* case is sufficient for the jury to infer discrimination. *Reeves*, 530 U.S. at 147. This is particularly true when there is evidence of mendacity. *St. Mary's*, 509 U.S. at 511.

Since *Reeves*, the Tenth Circuit has forcefully scrutinized motions that seek to usurp the jury's role as fact-finder in employment discrimination cases. *See, e.g., Townsend v.*

---

[5] A plaintiff in an ADA retaliation suit need not show he suffered from an actual disability as long as he had a "reasonable, good faith belief the statute ha[d] been violated." *Selenke v. Medical Imaging of Colo.,* 248 F.3d 1249, 1264 (10th Cir. 2001).

*Lumbermens Mut. Cas. Co.*, 294 F.3d 1232 (10th Cir. 2002) ("a rational finder of fact could reasonably find the defendant's explanation false and could infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose,"); *see also, EEOC v. Horizon Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000) (reversing the grant of summary judgment to the employer in a disparate treatment discrimination case where a reasonable jury could conclude that defendant's explanation for its actions was pretextual).

This court has been particularly mindful of the role of the trier of fact and the appropriateness of the trial judge resolving disputed issues of fact on summary judgment.  As this court stated in *Ziegler v. Inabata of America, Inc.*, 316 F.Supp.2d 908, 914-915 (D. Colo. 2004) where there are disputed issues of fact:

> A trier of fact must resolve these disputed issues in order to determine if there is a viable claim for [wrongful discharge]. In my view, these questions are appropriately determined not by a trial judge on summary judgment, but by a jury whose primary function is to make determinations about people's conduct based on subjective standards. See generally, A. Miller, The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding our Day in Court and Jury Trial Commitments? 78 N.Y.U. Law. R. 982, 1132 (June 2003) (consideration of objective standards of "human behavior, reasonableness, and state of mind [are] matters historically considered at the core province of jurors"). In Professor Miller's words, a decision now that no reasonable juror could find that Ziegler was terminated for refusing to violate a patent "discount[s] (1) the importance of a jury's evaluation of witnesses, (2) the greater sensory impact on the trier of live testimony, and (3) the value of trial cross-examination based on a full presentation of the evidence." Id. at 1090.

*Ziegler* at 914-915.

Pretext may be shown by a variety of evidence and no one type of evidence is required. *Doeblele v. Spring/United Mgt. Co.*, 342 F.3d 1117, 1137 (10th Cir. 2003).  Evidence of pretext may include such evidence as disturbing procedural irregularities, or the use of subjective criteria.  *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005).

Additionally, evidence of pretext may include evidence that Defendant did not follow its usual procedures or that plaintiff was treated differently than other employees. *Doebele*, 342 F.3d at 1137. A Plaintiff need not discredit all of the Defendant's reasons for the jury to determine that the employer lacks credibility. *See, Tyler v. REMAX Mountain Sates, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000).

Because there is evidence of pretext as well as disputed issues of material fact regarding Defendant's underlying rationale supporting its reason for terminating Mr. Aman and evidence of mendacity, this case fits squarely within those cases that are inappropriate for summary judgment.

a.    There are Disputed Facts About Ruby's Shifting Reasons for Terminating Mr. Aman.

Inconsistency evidence, has traditionally been associated with proving pretext. *See, Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1310, 1311, 1312 (10th Cir.2005). In other words, an employee relies on an employer's change in explanation to show that the employer is "attempt[ing] to mask an illegitimate motive." Id. at 1312. Furthermore, the 10th Circuit has recognized that inconsistency evidence is helpful to a plaintiff if " the employer has changed its explanation under circumstances that suggest dishonesty or bad faith." *Id*. at 1310. Those circumstances exist in this case.

When Mr. Aman came into the store on June 2, 2008 to bring in his doctor's note, Ruby told him he was fired because he was a no call/no show on May 13, 14, 15, 16 and 17. (SADF, ¶ 128.) Mr. Aman told him that he had called each day and volunteered to bring in his phone records. (SADF, ¶ 134.) On June 7, 2008 Mr. Aman returned with his phone records showing that he had called in 2 hours before his shift for each day that Ruby claimed that he had not

called.  (SADF, ¶ 135.)  Mr. Aman also told Ruby specifically whom he had spoken with on each day.  (SADF, ¶ 136-137.)  Ruby took notes that confirm the identity of the individuals Mr. Aman spoke with.  (SADF, ¶ 136.)  Mr. Aman's calls were also reflected on the dailies, which King Soopers uses to show who is scheduled to work on a daily basis.  (SADF, ¶ 99-100.)  All of the individuals Mr. Aman called were appropriate individuals for Mr. Aman to contact to report a sick call.  (SADF, ¶ 48-79.)

After Ruby received the undisputed confirmation that Mr. Aman had indeed called in for each day, Ruby changed his reason for terminating Mr. Aman now saying it was because Mr. Aman was a no call/no show on May 21, 22 and 23rd.  (SADF, ¶ 138.)  However, Mr. Aman had been taken off the schedule and was not scheduled to work on May 21, 22 and 23rd.  (SADF, ¶ 139.)  Ruby told Mr. Aman that on the last day that he called, May 18, 2008, he had been told by an appropriate management person to bring in a doctor's note when he returned and he did not need to call in daily anymore.  (SADF, ¶ 69, 77.)  This was consistent with the policies and practices at Store No. 5.  (SADF, ¶ 77.)  Other employees confirmed that Mr. Aman had been taken off the schedule.  (SADF, ¶ 68.)  It would be absurd to take Mr. Aman's name off the schedule unless King Soopers was aware that he had been told to bring in a doctor's note when he returned.  Given these facts, a jury could reasonably infer that all of the calls Mr. Aman made to King Soopers were made in accordance with King Soopers' policies and practices and that King Soopers was manufacturing reasons to terminate Mr. Aman as a means of exercising discriminatory or retaliatory animus toward him.

Faced with this conundrum Ruby changed course again this time claiming that Mr. Aman was terminated because his calls were "inappropriate" because they were not made to his

"immediate supervisor" which generated the letter of May 20, 2008. (Brief pg. 37.)   In its Motion, King Soopers consistently asks this court to rely on testimony supporting its version of the facts and draw inferences and accept disputed facts in favor of its interpretation of events. Ruby's credibility is inherently suspect.  As this court has previously held, "these questions are appropriately determined not by a trial judge on summary judgment, but by a jury whose primary function is to make determinations about people's conduct based on subjective standards." *Ziegler* at 914-915.  Defendant's changing reason for the termination is evidence of mendacity and pretext.

        b.      There is a Genuine Issue of Fact Regarding Whether Defendant Actually Sent Mr. Aman the May 20, 2008.

Mr. Aman has consistently testified that he did not receive the letter of May 20, 2008 until after he was terminated.  (SADF, ¶ 111.)  Defendant has not identified a single witness who testified that the letter was actually mailed.  Other evidence also supports a conclusion that the letter was never mailed.  It was the practice at Store No. 5 to send letters like the May 20, 2008 letter **by certified mail prior to** terminating an employee for an unexcused absence.  (SADF ¶ 105.)  In fact, another employee had received a letter similar to the letter of May 20, 2008 by certified mail and the signed certified mail receipt was placed in his personnel file.  (SADF, ¶ 162.)  There was no certified mail receipt in Mr. Aman's personnel file. Ruby conceded that the letter was not sent by certified mail and had no explanation as to why Mr. Aman would be treated differently than the other employee.  (SADF, ¶ 162.)

Here, King Soopers essentially argues that the Court should draw inferences in its favor and conclude that it actually mailed the letter of May 20, 2008 and it was received by Mr. Aman prior to his termination.  However, conflicting evidence supports a conclusion that the letter was

never mailed.  A fact is genuine if it could lead the trier of fact to find in favor of the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.1997).  Defendant's failure to send Mr. Aman the letter of May 20, 2008 is evidence of pretext and mendacity.  Viewed in the light most favorable to Mr. Aman and drawing all inferences in his favor, Defendant's failure to "give him an opportunity to prevent the discharge" by sending him the May 20, 2008 letter **prior to** terminating him as was King Soopers' practice, could lead the trier of fact to disbelieve Defendant's stated reason for terminating Mr. Aman.

c.   There is a Genuine Issue of Fact Regarding Whether Mr. Aman was Required to Speak to His Immediate Supervisor to Report an Absence.

King Soopers asks this court to credit its version of the facts and accept as true its contention that Mr. Aman's calls were "inappropriate" because they were not made to his "immediate supervisor."  (Brief pg. 37.)  However, that fact is hotly disputed.  King Soopers' personnel policies permit an employee to call in to his "immediate supervisor or another member of management."  This is also consistent with the practices at Store No. 5.  That an employee could call in to the Night Crew Foreman, Grocery Manager or a Head Clerk.  (SADF, ¶ 55-79.) From May 13 – 18 Mr. Aman placed seven calls into King Soopers.  (SADF, ¶ 64-67.)  Those calls were made to either Vercury Williams - Grocery Manager; Carlos Hill – Head Clerk; Dave Schooner – Night Crew Foreman; or Phil Hatchett – Night Crew Foreman.  (SADF, ¶ 64-67.) All of the individuals Mr. Aman spoke with are appropriate individuals that Mr. Aman was permitted to speak with when he called in sick.  (SADF, ¶ 48, 62, 83.)

As further grounds King Soopers also argues that, "Plaintiff never spoke to Ruby (or any manager) to have his absences excused."  (Brief pg. 37.)   However, it was not a policy, practice or requirement to have the absence excused **prior to** returning to work from sick leave but to

bring in the doctor's note when the employee returned to work because it was the doctor's note that provided the excuse!  (SADF, ¶ 76-78.) When questioned about whether it was the practice at Store No. 5 for the management personnel who took a sick call to tell the employee to bring a doctor's note when they came back in to work, Smith responded "[a]bsolutely."  (SADF, ¶ 78.) This was also consistent with King Soopers' policies.  (SADF, ¶ 79.)

Ultimately, resolution of these issues involves consideration of objective standards of human behavior, reasonableness, and state of mind and are matters historically considered at the core province of jurors whose primary function is to make determinations about people's conduct based on subjective standards.  *Ziegler* at 914-915.  Given these standards, and the fact that the evidence in the record clearly establishes genuine issues of material fact, Defendant should not be entitled to summary judgment.

> d.   Prior to Sending the May 20, 2008 Letter King Soopers Upper Management, Including Mr. Aman's Immediate Supervisor, were aware that Mr. Aman Had Called In Sick.

A plaintiff can demonstrate pretext "by showing that an employer's proffered explanation is unworthy of credence."  *Randle v. City of Aurora*, 69 F.3d 441, 452 (10th Cir. 1995 (internal quotation omitted).  This is done by pointing to "weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered reason for its action.  *Pastran*, 210 F.3d at 1206. "[D]isbelief of the defendant's articulated reasons for its actions, together with a *prima facie* case, can establish unlawful discrimination."  *Randle*, 69 F.3d at 452.

Defendant's story about needing to send the May 20, 2008 letter because Mr. Aman did not call his "immediate supervisor" is implausible for a number of reasons.  First, it was the practice at Store No. 5 that when an employee called in sick the manager receiving the call

would record it on the daily or verbally notified the Head Clerk of the call.  (SADF, ¶ 71-79.)

Second, the dailies specifically documented that "Moe" Mr. Aman called in on May 13, 15, and

17th and also a notation on the 17th showing that he "called in all week."  (SADF, ¶ 99.)  Third,

the notations on the daily were sufficient to put management on notice that Mr. Aman had called

in.  (SADF, ¶ 99-100.)   It makes no sense that King Soopers would send Mr. Aman a letter

inquiring about his absences when it had actual notice that he had called in all week.

Further, Defendant contends "store management generally tries to contact absent

employees to determine why they are absent and when they are likely to return" and while Mr.

Aman was out "the assistant to the service desk manager attempted to reach Plaintiff by

telephone." (Brief, pg. 16, ¶ 115, 116.)   Contrary to Defendant's claims, Mr. Aman's phone

records show that there were no incoming calls from King Soopers and no calls from a number

unfamiliar to Mr. Aman.  (SADF, ¶ 117-125.)  Moreover, Mr. Aman's phone number was the

same number that he had reported to King Soopers and had been used by King Soopers to call

him in the past.  (SADF, ¶ 117-125.)     Finally, King Soopers employees concede that the

assistant to the service desk manager never actually called Mr. Aman.  (SADF, ¶ 117-125.)

  e. Mr. Ruby Treated Similarly Situated Employees More Favorably Than Mr. Aman and Used Subjective Criteria in Making Disciplinary Decisions.

A plaintiff may show pretext by providing evidence that he was treated differently from

other similarly situated employees who are outside his protected category and who violate work

rules of comparable seriousness.  With no supporting authority whatsoever Defendant argues that

there are no other employees at Store No. 5 that are similarly situated to Plaintiff.  (Brief pg. 38.)

Defendant bases its argument on disputed issues of fact regarding Mr. Aman's phone calls to

store management and Defendant's failure to send Mr. Aman the letter of May 20, 2008.[6] Concluding that Plaintiff is not similarly situated to other employees based on disputed issues of fact improperly short circuits Plaintiff's ability to prove pretext. Even if it didn't, however, that is not the law in this Circuit. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1233 (10th Cir. 2009) citing, *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

In this case Ruby made all termination decisions at Store No. 5, including Mr. Aman's. Accordingly, all employees at Store No. 5 who were members of Mr. Aman's bargaining unit are similarly situated. Here, there is sufficient evidence that other employees similarly situated to Plaintiff had far more serious attendance issues than Mr. Aman that resulted in little or no discipline. Terry Herrod, who is white, had a long history of attendance problems. (SADF, ¶ 162.) He had an unexcused absence on July 15, 2008 and was not disciplined. On March 16, 2012 Ruby gave him a written warning for excessive absenteeism/tardiness because he had "**15 sick calls since Sept 2011 and 83 lates since September.**" On May 8, 2012 Herrod had been absent without leave for five days and had not called in during those five days. On May 14, 2012, King Soopers sent him a letter **by certified mail** asking him to contact Ruby no later than three days from the date of the letter. A copy of the certified mail receipt was included in Herrod's personnel file. Ruby testified that he sent the letter by certified mail to make sure that

---

[6] Defendant also argues that Mr. Aman was not similarly situated to any other employee because "other employees contact the Store Manger upon receiving a termination letter." (Brief pg. 38.) However, it is undisputed that Mr. Aman did not receive the termination letter of *May 27, 2008* because the letter was returned to King Soopers as "undeliverable" because King Soopers had failed to properly address it. (See Ex. 50.)

Herrod received it and that it was delivered to the address that was on file.  When Ruby spoke with Herrod, Herrod told him that he had not called in because "he thought he was on vacation." Herrod had no documentation showing that he had made a vacation request.  Ruby excused Herrod's five days of no calls/no shows.  (SADF, ¶ 162.)

In spite of Herrod's absence without leave for five days and his prior excessive absenteeism problems, Ruby testified that he did not terminate or discipline Herrod because Herrod called in within three days with the excuse that he "thought he was on vacation."  In other words, Ruby used subjective criteria to excuse Herrod's absence when he clearly violated company policy by not calling in or showing up for five days but fired Mr. Aman although he called in each day he was absent but did not respond to a letter that he did not receive. Accordingly, the comparator evidence available and Ruby's use of subjective criteria in making disciplinary decision raises a genuine issue of fact and supports an inference of pretext.  *See Garrett*, 305 F.3d at 1221.

Another employee, Glenna Brooks, who still works at King Soopers and is white, has a history of excessive absenteeism/tardiness going back for over 10 years.  On 7/16/95 she received a written warning for missing 10 days in past 3 months.  On 3/07/99 she received a written warning for missing 10 days since start of year.  On 10/10/99 she received a written warning for 10 more sick calls since 3/7/99.  On 6/25/00 she received a written warning for 23 more days of excessive absence.  On 04/15/06 she received a Written warning for being late.  On 10/04/06 she received an excessive absenteeism behavior notice for sick call.  On 04/17/11 she received a written warning for excessive absenteeism.  On 08/31/11 she received a 1 day suspension for calling in sick 4 days.  On 06/09/12 she received another written warning for

calling in sick.  (SADF, ¶ 161.)  Finally, Eric Gonzales, who is Hispanic, was a no call/no show more than one time.  (SADF, ¶ 159.)  His personnel files show no disciplinary action for being a no call/no show.

      f.     <u>Pattern of Discriminatory Conduct.</u>

      The Tenth Circuit has recognized that evidence of a pattern of discriminatory conduct can establish pretext.  *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 561 (10th Cir. 1996.)  In this case Ruby testified that Bouknight recommended that he terminate Mr. Aman.  There is evidence that Bouknight showed discriminatory animus against those who complained about discriminatory conduct.   In another ADA case, *Scavetta v. Dillon Companies, d/b/a/ King Soopers, Inc.*, 10-cv-02986, Bouknight threatened to terminate an employee who requested an ADA accommodation stating "[i]f she really wants to force the issue **it won't take long before we reach termination.**"  The employee was terminated days later.  (SADF, ¶ 167.)  This is compelling evidence from which a jury may infer that King Soopers created the circumstances to justify termination to cover up its animus towards employees with ADA complaints.  Bouknight's "recommendation" could likely have been fueled by discriminatory animus.

      g.     <u>Offensive Collateral Estoppel Bars King Soopers from Re-litigating the Issue of Whether it Made a Good Faith Effort to Adopt and Enforce Policies and Procedures to Prevent Violations of the ADA</u>.

The offensive use of the doctrine of collateral estoppel was explained by the 10th Circuit as follows:

> "When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). *Parklane Hosiery* sanctioned the offensive use of collateral estoppel, permitting a plaintiff to "foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." 439 U.S. at 326 n.4.

Under *Parklane*, if the components of collateral estoppel are satisfied, its benefits of economizing judicial resources and lessening the burdens of relitigating identical issues already decided, would be afforded a non-mutual plaintiff provided defendant had previously had a full and fair opportunity to litigate the issue. Importantly, the decision to eliminate the mutuality requirement to permit the plaintiff such a windfall was placed within the trial court's "broad discretion." Id. at 331.

In this Circuit, application of collateral estoppel requires: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Dodge v. Cotter Corp.,* 203 F.3d 1190, 1198 (10th Cir. 2000)

As it applies in this case, all of the elements required to apply collateral estoppel offensively are met.  Bouknight attended the trial of *Julie Jacobson v. King Soopers*, 10-cv-01944-LTB-BNB, another ADA case.    (SADF, ¶ 163.)  On or about May 5, 2012 the jury reached a verdict against King Soopers finding that King Soopers did not make a good faith effort to adopt and enforce policies and procedures to prevent violations of the ADA.  (SADF, ¶ 163-165.)  The policies that were in force during the time period of the *Jacobsen* case were the same policies that were in force in 2008 when Mr. Aman was terminated.  (SADF, ¶ 166.)  Not only is King Soopers estopped from re-litigating this issue at trial, the jury's determination is also powerful evidence of pretext.

## D.    PLAINTIFF WRONGFUL DISCHARGE PUBLIC POLICY CLAIMS SURVIVES.

Defendant argues that Mr. Aman cannot establish a causal connection between his workers' compensation claim and his discharge and that Mr. Aman has no evidence that King Soopers opposed his exercise of his workers' compensation rights because at the time of his termination he had reached MMI and was receiving no treatment.  Defendant further concludes

that Ruby made the decision to discharge Plaintiff a full year after his workers' compensation claim.

However, Defendant ignores the fact that it was Bouknight that recommended Mr. Aman's termination.  Moreover, according to her, when a workers' comp case is closed and the employee claims to have an aggravation of his workers' comp injury, that claim "still goes into the workers' comp arena" and it is the workers' comp doctor that the employee sees.  Bouknight further testified that Mr. Aman could not take sick leave in May 2008 and all of his "reimbursements, his funds, wages, whatever, would have come out of the workers' comp."  (Ex. 55: at 136: 17 – 139: 9.)  Based on Bouknight's theory, a jury could certainly infer causation given that Mr. Aman began his leave on May 13, 2008 which, according to Bouknight, essentially triggered his workers' comp claim then Bouknight recommended that he be terminated just 14 days later.

**E.     PLAINTIFF HAS STATED A HOSTILE WORK ENVIRONMENT CLAIM.**

To establish a claim for hostile work environment, Mr. Aman must show that there was a hostile environment at King Soopers that was sufficiently severe or pervasive to alter the conditions of his employment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Evaluation of whether the hostility is severe or pervasive is particularly unsuited for summary judgment because it is "quintessentially a question of fact."  *O'Shea v. Yellow Tech. Serv's*, 185 F.3d 1093, 1098 (10th Cir. 1999) (citations omitted).  Whether the work environment is hostile is not a mathematical calculation; in some cases, a single incident of threatening conduct may be sufficient.  *Lockard v. Pizza Hut, Inc*. 162 F.3d 1062, 1071-72 910th Cir. 1998).  In analyzing a hostile work environment claim, a court must consider the totality of the circumstances,

examining the record as a whole. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (20020; *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 – 87 (10th Cir. 2007).

Taking the evidence in the light most favorable to Mr. Aman, the assault against Mr. Aman by Gordy on May 7, 2007 is the type of single incident that is severe or pervasive enough in itself to support a hostile work environment claim. Moreover, Gordy's comment calling Mr. Aman an "African monkey" before that assault as well as his comments to Goldis that he did not like Black people were both reported to Ruby, who took no action in either case. From this evidence a jury could infer Gordy's racial animus **and Ruby's** as well for his failure to address these issues. After the May 2007 assault Bateson, who had called Mr. Aman a "lazy African" continued his harassing conduct. Ruby was aware of that conduct as well.

Finally, with regard to the timeliness of Mr. Aman's hostile work environment claim, Defendant alleges that there were no events that occurred after May 17, 2008 that comprise his hostile work environment claim. The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. *Nat'l R.R. Passenger Corp. v. Morgan*, 356 U.S. 101, 117 (202)

After May 17, 2008 King Soopers continued to create a hostile work environment for Mr. Aman by alleging that it sent Mr. Aman correspondence to allow him to cure his purported no call no shows when in fact King Soopers never sent the correspondence; claiming that it called

Mr. Aman to find out about his absence when in fact there was never a phone call to Mr. Aman; imposing different standards on Mr. Aman that he can only call in to his "immediate supervisor" to call in sick when in fact the policies and practices impose no such obligation; imposing different standards that required only Mr. Aman to bring in a doctor's note before he took sick leave when this went against King Soopers' policies and practices; and sending his correspondence to the wrong address.

As it has throughout its brief, Defendant asks this court to draw inferences in its favor to infer that the pre-May 17, 2008 conduct had no connection whatsoever to the actions taken against Mr. Aman after May 17, 2008.  This is particularly a jury decision because it was Ruby who treated employees like Herrod more favorably than Mr. Aman by actually communicating with them about their absences and allowing them some latitude in calling in and excusing his absence.  Thus, whether or not a hostile work environment existed is quintessentially a question of fact unsuited for summary judgment.

### VI.     CONCLUSION

Taking the evidence in the light most favorable to Plaintiff, as is required in deciding a motion for summary judgment, there are genuine issues of material fact regarding each element of Plaintiff's claims.  Accordingly, Defendant's motion must be denied.

Respectfully submitted this 21st day of March, 2013.

Robinson & Associates Law Office, LLC

/s Jennifer Robinson                              /
Jennifer Robinson
7900 E. Union Ave., Suite 1100
Denver, CO  80237
(303) 866-9793
ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 21st day of March 2013 a true and correct copy of

the foregoing was electronically served to the following addresses:

William A. Wright
Raymond M. Deeny
Karla E. Sanchez
Sherman & Howard L.L.C.
633 Seventeenth Street, Suite 3000
Denver, CO  80202

/s Jennifer Robinson                              .