IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-02973-JLK

MOE AMAN (f/k/a/ MOHAMMED AMAN),

     Plaintiff,

v.

DILLON COMPANIES, INC. d/b/a KING SOOPERS, a Kansas Corporation

     Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ECF DOC. 25**

---

Kane, J.

This grocery store employment discrimination dispute is before me on a Motion for Summary Judgment, Doc. 25, filed by Defendant Dillon Companies, Inc. d/b/a/ King Soopers. For the reasons that follow, King Soopers' motion is GRANTED as to the reassignment claims and the ADA discrimination based discharge claim, and otherwise DENIED as to all remaining claims.

I.     Jurisdiction, Venue, Choice of Law

Mr. Aman states thirteen claims for relief under Title VII, 42 U.S.C § 1981, and the American with Disabilities Act (42 U.S.C. § 12101 *et. seq.*) (the "ADA"). Because Mr. Aman's causes of action arise under federal law, I have original jurisdiction per 28 U.S.C. § 1331. I also have jurisdiction under 28 U.S.C. § 1343(a) because Mr. Aman seeks relief for the alleged deprivation of his federally protected rights and privileges. The parties stipulate that a substantial part of the events or omissions giving rise to Mr.

Aman's claims occurred in Colorado, therefore venue is proper under 28 U.S.C. §

1391(b)(2) .  Compl. ¶ 2; Answer ¶ 2.

## II.    Summary Judgment Legal Standard

Summary judgment is appropriate if there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

*Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir.

2008).  A disputed fact is material if it could affect the outcome of the suit under the

governing law.  *Adamson*, 514 F.3d at 1145.  A factual dispute is genuine if a rational

jury could find for the nonmoving party on the evidence presented.  *Id.*  The moving

party bears the burden of showing that no genuine issue of material fact exists.  *Adamson*,

514 F.3d at 1145.  Where, as here, the moving party does not bear the ultimate burden of

persuasion at trial, it may satisfy its burden by showing a lack of evidence for an essential

element of the nonmovant's claim.  *Id.*  In deciding whether the moving party has carried

its burden, I may not weigh the evidence and must view the evidence and draw all

reasonable inferences from it in the light most favorable to the nonmoving party.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Adamson*, 514 F.3d at 1145.

Neither unsupported conclusory allegations nor a mere scintilla of evidence in support of

the nonmovant's position are sufficient to create a genuine dispute of fact.  *See Mackenzie*

*v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005); *Lawmaster v. Ward*,

125 F.3d 1341, 1347 (10th Cir. 1997).

## III.    Factual Background

Moe Aman immigrated to the United States from Ethiopia in 1999 and shortly thereafter became an employee of Defendant King Soopers. Ex. 1, 20:15–22:14. He worked for King Soopers for 7.5 years, from November 13, 2000 until his termination on May 27, 2008. King Soopers is a Colorado-based supermarket chain wholly owned by Dillon Companies, a Kansas corporation. Mr. Aman worked at two different King Soopers stores in Denver, Colorado during his employment. The relevant events to this case took place at Store # 5 under the management of Jack Ruby, an employee with a 39 year history at King Soopers, 14 of which as a store manager. Ex. 5, 5:10–6:21. Mr. Ruby has been the store manager at Store #5 for 12 years. *Id.*

For most of his tenure, Mr. Aman was employed at Store #5 as a part-time produce clerk. Per the produce clerk written job description, his duties in that role included lifting and carrying loads of produce, unloading delivery trucks, and stocking the produce department. Ex. 22 (produce clerk job description). The testimony of Mr. Aman himself as well as others repeatedly confirms this paper requirement as also a requirement in fact. Ex. 1, 52:5–55:4 (Mr. Aman describing his produce clerk duties as including: "Cashier, stocking, customer service, loading and unloading trucks."); *see also* Ex. 5, 16:14–17:2 (Mr. Ruby describing Mr. Aman's primary duties and problems with his performance of those duties).

Mr. Aman began working at Store #5 in February 2006. Initially, his supervisors were produce manager, Don Gordy, and assistant produce manager, Chris Bateson. Both are white males. Mr. Aman claims to have endured a litany of abuses at the hands of Messrs. Gordy and Bateman from the very start of his employment at Store #5. Mr.

Aman alleges that while he received a warm welcome from all of the other employees present on his first day, Mr. Bateson refused to shake his hand.  Ex. 1 at 129:6–13.  He was told later that day by an African American employee that Mr. Bateson does "not like black people," and referred to them as "African monkey[s]."  *Id.* at 129:11–21.  Although apparently never called an "African monkey" by Mr. Bateson, once in early 2007 Mr. Bateson called him a "lazy African" because he mistakenly believed that Mr. Aman had left a shipment of strawberries unrefrigerated.  *Id.* at 130:9–17;131:13-25.  Also in early 2007, Mr. Gordy once called Mr. Aman an "African monkey while the two were working in the stockroom, and Mr. Gordy referred to him as an "African lion" sometime after that. *Id.* at 143:19-25; 144:1-9.

During this time period Mr. Gordy and Mr. Bateson allegedly twice changed Mr. Aman's schedule by taking hours away from Mr. Aman and giving them to an employee with less seniority and who also happens to be Mr. Ruby's nephew-in-law. Ex. 1 at 125:6–128:19.  Mr. Aman later filed a grievance over these alleged changes with his union, the United Food and Commercial Workers Union.  Ex. 17 at 1094.

According to Mr. Ruby and his assistant manager, Terri Smith, however, Mr. Aman had a history of misunderstanding how the King Soopers' scheduling system operated. Ex. 5 at 145:10–148:1 (Mr. Ruby describing times when Mr. Aman complained to him); Ex. 9 at 58:15–60:21 (Ms. Smith describing incident where she had to explain how scheduling worked after Mr. Aman complained that his lack of hours was racially motivated).  Ms. Smith, who is African American, attempted to explain to Mr. Aman that King Soopers allocates a specific number of hours per department for a scheduling

period, and managers have an obligation under the collective bargaining agreement between the company and Union to ensure that all part-time employees get at least 20 hours per week. Ex. 9 at 58:19–60:18; *see also* Ex. 4 at 9:14–10:15 (assistant produce manager Robbie Casados describing how hourly employees select shifts and the hours allocation process for part-time employees). According to another hourly produce employee, Marcey Goldis, Ms. Smith provided additional training on selecting shifts to all of the produce employees to prevent further disagreement. Ex. 15 at 60:9–21 (Ms. Goldis describing Ms. Smith's re-training).

Additionally, Mr. Ruby attempted to explain how the scheduling system worked when Mr. Aman complained about his hours. Ex. 5 145:25–148:1. According to Mr. Ruby, Ms. Smith spent considerable time with Mr. Aman explaining the scheduling system to him and generally attempting to help him develop as an employee. Ex. 5 at 16:11–17:7. On December 4, 2007, the Union withdrew Mr. Aman's scheduling complaint, finding he was indeed offered the most possible hours available to him at the time. Ex. 17 at 1095, 1097.

### A. *Mr. Aman's Workers' Compensation Claim and Termination*

Mr. Aman's relationship with Mr. Gordy came to a head on May 7, 2007 when Mr. Gordy pushed a cart into Mr. Aman and another employee in the store's stockroom. Ex. 1 (Behavior Notice statement). Mr. Aman was injured and Mr. Gordy was fired. *Id.* (reason for Mr. Gordy's discharge); Ex. 2 (Termination Form for Mr. Gordy). Mr. Aman suffered back problems from the incident and filed a workers' compensation claim. Ex. 1; Ex. 5 (Physician's Report of Worker's Compensation Injury). After a course of

various treatment, his appointed physician, Dr. Franklin Shih, concluded on October 11, 2007 that Mr. Aman had reached his Maximum Medical Improvement (MMI). *Id.* Dr. Shih diagnosed Mr. Aman with a Permanent Impairment to his back, and provided the following Permanent Restrictions: Lifting, carrying, pushing, and pulling all limited to no more than thirty pounds on an occasional basis. *Id.*

Despite his restrictions, Mr. Aman continued to work as a produce clerk throughout 2007. King Soopers' management provided accommodation for him during this time. Specifically, King Soopers allowed Mr. Aman to rely heavily upon "buddy lifts," by which another employee would aid him to move objects over 30 pounds. Ex. 5 at 27:4–28:14 (Mr. Ruby's  description of Mr. Aman's accommodation with the "buddy lift").  In addition to this accommodation, Mr. Aman, because of his seniority, was often able to avoid heavy lifting by selecting shifts working in the "cut fruit" section of the produce department. *Id.* at 21:9–24:11 (Mr. Ruby describing the cut fruit position, how Mr. Aman could select this shift, and the lifting accommodations made during the cut fruit shift). The cut fruit shift did not require frequent lifting over 30 pounds. *Id.* Mr. Ruby and Ms. Smith were both aware of Mr. Aman's restrictions and accommodation. *Id.*; Ex. 10 at 10:25–11:1 (Smith deposition).

In March 2008 Mr. Aman obtained a second diagnosis by requesting an Independent Medical Examination (IME) through the workers' compensation program. Ex. 24 (request for IME); Ex. 25 at 2 (IME results). The IME, performed by a different, independent physician, Dr. John Tobey confirmed that Mr. Aman had reached MMI,

recommended that the earlier restrictions should remain in place, and prescribed a pain management regimen.  Ex. 25 at 3, 5.

King Soopers' Personnel Policies manual requires an employee assessment to be conducted after a determination of MMI in order to identify other positions the employee could do without accommodation.  Ex. 11 at 31-32.  Per this policy, on or about May 2, 2008 Mr. Aman met with Dimitri Clarke, a labor relations specialist with King Soopers.  Ex. 6 at 21:19–22:17 (Bouknight deposition); Ex. 28 (Clarke email).  During this meeting or shortly thereafter, Ms. Clarke made clear to Mr. Aman that his permanent inability to lift over thirty pounds made him ineligible under King Soopers' policies to continue as a produce clerk and that he was being offered a position at the service desk.  Ex. 13 at 11:21-28; Ex. 5 at 41:4-8; Ex. 27 at AMAN195; Ex. 28.  Because service desk employees earn less per hour than produce clerks, Mr.  Aman did not want to be reassigned to a service desk position and requested a leave of absence instead.  Despite some initial indication that this might be possible by Ms. Clarke, Ms. Clarke's supervisor, labor and employee relations manager Stephanie Bouknight, intervened to clarify to Mr. Ruby that the company's policy did not permit a leave of absence if there was a job available for the employee.  Ex. 5 at 40:17–41:18; see also Ex. 11 at 32 (company policy regarding leaves of absence).

On May 8, 2008, King Soopers provided Mr. Aman with formal notice of his assignment to the service desk.  Management's decision to move Mr. Aman to the service desk was premised on the fact that Store #5 did not require service desk employees to move any objects over thirty pounds.  Ex. 7 at 31:5-35:25; P. Ex. 8 (letter of notification

7

sent to Mr. Aman from Ms. Clarke).  Per the reassignment, Mr. Aman was reclassified as a "GG clerk," a classification encompassing both service desk workers and general merchandise workers.  *See foonote* 4.

Mr. Aman was scheduled to begin at the service desk on May 13, 2008.  Ex. 16 at 2.  Mr. Aman, however, never actually worked a shift at the service desk.  The record indicates Mr. Aman called in sick on May 13, 2008, and did not show up for work during any of his scheduled shifts until he was removed from the schedule and terminated on May 27, 2008.

Mr. Aman's phone records indicate calls into Store #5 early in the morning of May 13, late in the evening on May 13 (apparently to call in sick for the 14th), the early mornings of May 16 and May 17, and two calls on the morning of May 18.  Pl. Ex. 9.  King Soopers' daily schedules indicate Mr. Aman called in sick on May 13, did not call in on May 14, and called in sick on May 17 with the annotation that he was calling in sick "all week."  D. Ex. 16.  The daily schedules provide no other information after May 17, 2008.  Mr. Aman remained on the schedule and failed to show for work from May 21 through May 23, 2008.  Ex. 13 at 7:5–20.  According to King Soopers, Mr. Aman was fired for failing to show or call in over these dates.  *Id.*

Between May 10 and June 2, 2008 there was no communication between Mr. Aman and either Mr. Ruby or his new assistant manager John Quigley.  On June 2, 2008, Mr. Aman returned to the store and Mr. Ruby notified Mr. Aman of his termination.  *Id.* at 8:1–24.

### B.  Mr. Aman's Alleged Complaints of Mistreatment and Discrimination

On May 5, 2008, Mr. Aman complained to Ms. Clarke that he believed he had been discriminated against because of his injury at Store #5 and his race.  Ex. 44, ¶ 17; Ex. 28 (Clarke email).  Mr. Aman complained that the denial of his request for leave of absence was retaliation against him for exercising his workers' compensation rights. This complaint followed Ms. Clarke's statement earlier that day that a leave of absence was a possible course of action.  Ex. 1 at 194:6–14.  Mr. Aman also complained to Ms. Clarke about when he had been called a "lazy African" and an "African monkey." Ex. 1 at 148:8–10 (Aman deposition); Ex. 28 (Clarke email).  Mr. Aman stated that Mr. Gordy's assault and Mr. Bateson's changing his shifts indicated a pattern of harassment due to his race.  Ex. 1 at 192:5–16.  Mr. Aman further alleged to Ms. Clarke that Mr. Ruby had rebuffed his repeated complaints of discrimination.  Ex. 28; Ex. 1 at 192, 5:16; Ex. 19 at 6 (Charge of Discrimination).   These alleged rebuffs included Mr. Ruby not sufficiently addressing the racially harassing comments made to Mr. Aman or his scheduling concerns.  Ex. 28.

On May 7, 2008, under the theory of "unjust demotion," Mr. Aman filed a union grievance action for his transfer to the service desk.  Ex. 27 (Step 2 Meeting Form). After an internal investigation, the union dismissed Mr. Aman's grievance on September 25, 2008.  The union premised its dismissal on Mr. Aman's failure to return to work after he was directed to do so by King Soopers.  Ex. 34 (union letter dated Sep. 25, 2008); Ex. 29 (Explanation of Dropped Grievance); *see also* Pl. Ex. 12 (May 20, 2008 warning letter from King Soopers directing Mr. Aman to make contact with Mr. Ruby or face

termination).  The union later dismissed another grievance Mr. Aman initiated, this one for wrongful termination, because Mr. Aman failed to follow up with the Union per its request.  Ex. 40.  Unsuccessful with his union grievances, Mr. Aman filed a Charge of Discrimination with the Equal Employment Opportunity Commission, on March 13, 2009.  Ex. 19.

The EEOC's Denver Field Office issued a Determination on July 11, 2011 finding "reasonable cause" that King Soopers violated Mr. Aman's rights under the ADA by denying him a reasonable accommodation, removing the accommodation he had been working under as a produce clerk, and discharging him because of his disability and in retaliation for requesting a reasonable accommodation to continue working in produce. Ex. 15 ¶ 4.  The Commission made no other findings on Mr. Aman's other allegations under Title VII or Section 1981.  *Id.* at ¶ 5.  The EEOC did not analyze how it arrived at its Determination.

## IV.    Discussion

Mr. Aman brings thirteen claims relating to three employment actions. Specifically, he alleges:

(1) that his reassignment to the service desk was (a) race discrimination under Title VII and 42 U.S.C. § 1981 ("Section 1981") (Am. Compl. (12/20/2011), Doc. No. 8 at 14; (b) disparate treatment and failure to accommodate under the Americans with Disabilities Act ("ADA") (*id*. at 16-17); and (c) retaliation under Title VII and Section 1981 (*id*. at 19.);

(2) that his discharge on May 27, 2008 was (a) race discrimination under Title VII and Section 1981 (*id*. at 13); (b) disparate treatment and failure to accommodate under the ADA (*id*. at 15); (c) retaliation under Title VII and Section 1981 (*id*. at 18); (d) retaliation under the ADA (*id*. at 20); and (e) wrongful discharge in retaliation for filing a workers compensation claim (*id*. at 21-22); and

(3) that he was subject to a hostile work environment because King Soopers' employees assaulted him, called him racially derogatory names, changed his schedule, reduced his hours, refused to take action when he complained about harassment, denied him a reasonable accommodation, demoted him, denied him time off for religious observance and mocked his injury. (*Id*. at 20-21.)

This discussion of Mr. Aman's claims is organized below by employment action.

### A.  Mr. Aman Has Not Established Genuine Issues of Material Fact Concerning His Reassignment Claims

Title VII, 42 U.S.C. § 1981 and the Americans with Disabilities Act all prohibit employers from discriminating against employees and from retaliating against them for opposing any practice made unlawful by the applicable statute. Discrimination and retaliation claims under all three statutes are subject to the burden-shifting analyses of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-04 (1973). *Pastran v. K-Mart Corp*., 210 F.3d 1201, 1205 (10th Cir. 2000) (analyzing Title VII retaliation claim under the burden-shifting framework delineated in *McDonnell Douglas*); *Twigg v. Hawker Beechcraft Corp.,* 659 F.3d 987, 990 (10th Cir. 2011) (analyzing 42 U.S.C. §1981 retaliation claim under the burden-shifting framework delineated in McDonnell Douglas);

*EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1031 (10th Cir. 2011) (analyzing ADA retaliation claim under the burden-shifting framework delineated in *McDonnell Douglas*).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case. A plaintiff's proof may come by way of direct evidence, indirect evidence, or both.  *See Perry v. Woodward*, 199 F.3d 1126, 1134-35 (10th Cir. 1999) (distinguishing direct and indirect methods of proof). Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse actions(s). *Pastran* at 1205; *Twigg* at 998; *C.R. England* at 1051. If the employer meets that burden the plaintiff must then establish that the employer's proffered reason(s) are merely a pretext for unlawful discrimination. *Pastran* at 1205; *Twigg* at 998; *C.R. England* at 1051.

Mr. Aman's third and fourth claims for relief are premised on the allegation that his reassignment was in violation of Title VII and 42 U.S.C. §1981. Mr. Aman's sixth claim for relief is based on an allegation that his reassignment violated the ADA. King Soopers submits that (1) Mr. Aman's Title VII and ADA reassignment claims are untimely; and (2) in any event, Mr. Aman has "no evidence" that King Soopers discriminated against him because of his race or disability or retaliated against him.  Doc. 36 at p.23.  Although I disagree with King Soopers on the issue of timeliness, but agree with it on the merits of the claims, I GRANT summary judgment in favor of King Soopers with respect to Mr. Aman's third, fourth, and sixth claims.

1.  <u>Mr. Aman's Title VII and ADA Reassignment Claims Are Timely Because Waiver Applies</u>

An aggrieved employee must file a Charge of Discrimination under Title VII or the ADA within 300 days of the alleged violation. 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a). "The limitations period begins 'on the date the employee is notified of an adverse employment decision by the employer.'" *Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 628 (10th Cir. 2012)(internal quotations omitted). The United States Supreme Court has held that the timely filing of an EEOC claim is not a jurisdictional prerequisite, but rather a requirement to suit that "is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc*. 455 U.S. 385, 385 (1982). Where an employer responds to the merits of an EEOC claim and does not mention a technical defect like timeliness, the employer waives the defense of the defect. *See Buck v. Hampton Township School Dist.,* 452 F.3d 256, 258 (3rd Cir. 2006)(finding that the verification requirement of the Charge was "analogous" to the time limit for filing charges with the EEOC and that, "[w]hen an employer files a response on the merits, he forgoes the protection that the requirement affords"); *EEOC v. JBS USA, LLC*, 794 F.Supp.2d 1188, 1198 (D.Colo.2011)(holding that employer who filed response to merits of EEOC charge was precluded from arguing that the EEOC charge lacked verification).

Mr. Aman learned of his reassignment on May 5, 2008. (Ex. 13 at 11:21-28; Ex. 5 at 41:4-8; Ex. 27 at AMAN195.) Three hundred *and twelve* days after, on March 13, 2009, Mr. Aman filed a Charge of Discrimination in which he, *inter alia*, protested his reassignment to the service desk. The relevant portion of the Charge reads:

T. I was supposed to begin my leave of absence on May 11, 2008,

however, when I went to confirm my leave with Ruby, Ruby told me that I could not take leave. Instead of allowing me to take a leave of absence, Ruby switched me to the Customer Service Department where I would be making approximately half (1/2) of what I was making in the Produce Department.

U.  I again protested the discriminatory and harassing treatment. This time, I believe that not only was I being discriminated against because of my race/national origin but also because of my perceived disability.  I reminded Ruby that Clark(sic) had suggested the leave of absence to begin with and that I still had back pain, which made it difficult for me to work.  Ruby responded that I had no choice and had to do as he directed.

Ex. 19 at p.4.

On May 8, 2009, King Soopers responded to Mr. Aman's Charge by issuing a

Position Statement including the following relevant language:

Charging Party claimed that his back was injured as a result of the incident with Gordy in May 2007. He later presented permanent restrictions and was determined by his physician to have reached maximum medical improvement.  These permanent restrictions included no lifting of more than 30 pounds, and limitations on repetitive lifting, carrying, pushing, and pulling.

King Soopers met with Charging Party to discuss these restrictions and to assess his ability to perform the essential functions of the produce clerk position.
This assessment revealed that Charging Party was unable to perform the essential functions of a produce clerk, but was able to perform the essential functions of the Service Desk Position. As a result, Charging Party was reassigned to the Service Desk.

On May 5, 2008, Charging Party contacted King Soopers Human Resources Department to discuss the assessment and his reassignment to the Service Desk.  Charging party stated that he did not want to work the Service Desk, and that he preferred to take a leave of absence instead.  HR informed Charging Party that since there was a job available that he could perform, he was not eligible for a leave of absence.  During this conversation, for the first time, Charging Party claimed the he had been harassed and discriminated against in the store.

Ex. 60 at p. 3.

King Soopers argues that its language regarding Mr. Aman's reassignment did not address the merits of the assignment and was instead an "application of the recited facts to (1) the allegation that Charging Party was terminated because he refused to report to work; (2) the allegation that Charging Party was denied the hours he was entitled to because of his seniority; and (3) the allegation that Plaintiff was subjected to harassment." Doc. 39 at p. 34. Therefore, King Soopers continues, it did not waive its statute of limitations defense with respect to the reassignment. I find this argument difficult to swallow.

Paragraph T of the Charge clearly states that Mr. Aman was not allowed to take leave and was instead reassigned. Paragraph U of the Charge unambiguously refers back to this conduct—"I again protested the discriminatory and harassing treatment." Ex. 19 at p.4. King Soopers does not dispute that Mr. Aman's charge included the allegation of discriminatory reassignment and the allegation was clearly known to King Soopers because it "applied" it in its position statement. Thus, King Soopers is essentially asking to benefit from its negligence in not explicitly addressing the merits of the reassignment claim.[1] *See Buck*, 452 F.3d at 264 (allowing employers to wait until a suit is filed to raise the verification issue "gives employers an incentive not to raise a plaintiff's failure to verify her charge

---

[1] It is worth pointing out that scheduling does more than let an employee know what times and days he is working. It also informs the employee of in what department he will be working and at what position. Accordingly, King Soopers' statement that "Charging Party was scheduled according to the terms of the collective bargaining agreement," could reasonably be construed as a remark addressing the merits of reassignment because scheduling encompasses assignment/reassignment.

15

before the EEOC, in the hope that plaintiff will not discover the 'technical' error until it is too late, and that the employer will be able to secure dismissal of any subsequent federal suit on that basis"). I interpret *Buck* to mean that if an employer responds to some of the merits in a Charge, waiver will apply to every clearly expressed issue in the same Charge.  Also, for the same policy reasons that require affirmative defenses to be stated in an Answer or pled in a responsive motion, I hold that if King Soopers believed the reassignment issue was not timely raised in the Charge, it should have said so in its Position Statement.  Because King Soopers could have but did not mention timeliness as a bar to Mr. Aman's reassignment claims, the claims do not fail for exceeding the limitations period.[2]

2.   Mr. Aman Fails to Make a *prima facie* ADA Discrimination Claim

To establish a *prima facie* case of disability discrimination a plaintiff must show that (1) he is disabled within the meaning of the ADA; (2) he is qualified for his employment position; and (3) the defendant discriminated against him because of his disability.  *Doebele v. Sprint*, 342 F.3d 1117, 1129 (10th Cir. 2003). The ADA defines disability as (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; B) a record of such an impairment; or (C) being regarded as having such an impairment. *Doebele* at 1129 – 1130.

Beginning with prong (1), Mr. Aman does not rely on an actual disability to support his ADA claim but argues that King Soopers regarded him as disabled.  To

---

[2] I am using the doctrine of waiver because I find support—though not direct authority—for it in *Buck* and *EEOC v. JBS*. I add, however, that equitable estoppel might be another way to skin this cat, though I did not determine whether there is case law on point.

pursue his regarded-as claim, Mr. Aman must show that someone at King Soopers responsible for the relevant employment decision mistakenly believed that Mr. Aman had an impairment he did not have that substantially limited him in one or more major life activities or mistakenly believed that Mr. Aman's actual impairment substantially limited him in one or more major life activities. *Rakity v. Dillon Cos.*, 302 F.3d 1152, 1162 (10th Cir. 2002).

Mr. Aman presents no evidence that any of the relevant King Soopers' employees—Ruby, Bouknight, or Clarke—mistakenly believed that he had an impairment, real or perceived, that substantially limited him in one or more major life activities. Rather, the decision makers were all aware of the non-substantially limiting medical restrictions that Mr. Aman's medical records indicated. Specifically, the undisputed facts show that Dimitria Clarke, an African American Labor Relations Specialist for King Soopers, met with Mr. Aman "to assess his ability to perform the essential functions of the produce clerk position." Ex. 6 at 22:9-14, Ex. 1 at 195:10-196:4, Ex. 1 at 196:5-197:17, 199:17-200:20. At the time Clarke performed the assessment, Mr. Aman had medical restrictions dating from October 11, 2007 that permitted him "only occasional lifting, carrying and pushing/pulling of no more than 30 pounds." Ex. 23; Ex. 1 at 199:23-25, 200:12-17. Mr. Aman also had a further restriction issued on March 18, 2008 from an Independent Medical Examination ("IME") that he requested on December 28, 2007, which specified his restrictions as "no lifting greater than 30-pounds. No pushing or pulling greater than 30-pounds." Ex. 25 at AMAN272. Mr. Aman admits by his own testimony that Clarke confirmed the 30-pound lifting

17

restriction.  Ex. 1 at 199:17-22.  These confirmed restrictions then formed the basis of King Soopers' determination that Mr. Aman was physically unable to perform the duties of the produce clerk position. Ex. 5 at 37.

King Soopers maintains that these restrictions do not amount to a substantial limitation in a major life activity.  *See Rakity v. Dillon Companies*, Inc., 302 F.3d 1152, 1160 (10th Cir. 2002) (finding limitation to lifting forty pounds occasionally and ten to fifteen pounds frequently does not establish a history of substantial limitation); *Pryor v. Tram Co.*, 138 F.3d 1024, 1025 n. 2 (5th Cir. 1998) (upholding jury verdict that twenty pound lifting restriction was not substantially limiting), *McKay v. Toyota Motor Mfg. USA, Inc.*, 110 F.3d 369, 373 (6th Cir. 1997) (ten pound lifting restriction was not substantially limiting), *Thompson v. Holy Family Hospital*, 121 F.3d 537, 540 (9th Cir. 1997) (twenty-five pound lifting restriction not substantially limiting), *Wooten v. Farmland Foods*, 58 F.3d 382, 384, 386 (8th Cir. 1995) (ten to twenty pound lifting restriction not substantially limiting).  No individual King Soopers employee has ever stated otherwise and Mr. Aman does not dispute that these restrictions do not amount to a substantial limitation in a major life activity. Further, no King Soopers employee has suggested that he disregarded the medical documentation to substitute his own assessment of Mr. Aman's abilities or lack thereof.  Accordingly, Mr. Aman has failed to meet his *McDonnell Douglas* burden of providing evidence suggesting that King Soopers regarded him as disabled within the meaning of the ADA.

For Mr. Aman to succeed on prong (2), he must introduce evidence to support a finding that he was able to perform the essential duties of the produce clerk position, with

18

or without reasonable accommodation. *See Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1173 (10th Cir.1996) (under the ADA, a "qualified individual with a disability" is one who can perform the essential functions of the position with or without reasonable accommodation.)  He has not done so.

To begin, it is undisputed that an essential function for a produce clerk is the ability to lift over thirty-pounds, Ex. 1 at 200:18-20; Ex. 15 at 18:1-3, Ex. 22, and, as mentioned above, it is undisputed that Mr. Aman's medical restrictions prohibit him from lifting over thirty-pounds.  Therefore, the only question is whether King Soopers could have provided Mr. Aman with a reasonable accommodation such that he could have performed the essential functions of a produce clerk.

Mr. Aman suggests he could have performed the essential functions of a produce clerk if King Soopers had continued to let his co-workers perform his heavy lifting and/or permitted him to make use of the "buddy lift" system, an arrangement in which one employee would assist another to lift a heavy object.  Amended Complaint (12/20/2011), Doc. No. 8 ¶ 44; Stipulated Scheduling and Discovery Order (2/08/2012), Doc. No. 11 at 2.  However, continuing these temporary accommodations would not have been a *reasonable* accommodation. *Robert v. Bd. Cnty. Comm'rs Brown Cnty.*,  691 F.3d 1211, 1218-19 (10th Cir. 2012) (holding that an indefinite reprieve from essential functions of a position is unreasonable as a matter of law).  According to Mr. Ruby, even produce clerks assigned to duties involving the least amount of lifting, such as those on the "cut-fruit" assignment, had to lift over 30 pounds daily. Ex. 5 at 24:4-11. If Mr. Aman had to make use of the buddy lift system daily, it would defeat the purpose of having King Soopers'

having a requirement that produce clerks can lift thirty pounds.  The "requirement" would be no requirement at all, if such a work-around was so easily achieved.

Alternatively, Mr. Aman suggests a leave of absence as an accommodation. Amended Complaint (12/20/2011), Doc. No. 8 ¶¶ 46, 48; Stipulated Scheduling and Discovery Order (2/08/2012), Doc. No. 11 at 2. Granting a leave of absence would not have been a reasonable accommodation, however, because Mr. Aman's medical records expressed that he had reached maximum medical improvement ("MMI") and that his restrictions were *permanent*.  *See* Ex. 60 at p. 3. Mr. Aman did not present King Soopers with any medical certification showing or even speculating that he could improve his condition after reaching MMI. *See* Ex. 13 at 24:7-10, 24:28-25:11.  A leave of absence, without any basis to believe the employee would be able to perform the essential functions upon his or her return, is not a reasonable accommodation.  *Hudson v. MCI Telecomm. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996)(leave is not reasonable where plaintiff presents no medical records discussing the prospects of recovery).

Finally, with respect to prong (3),  King Soopers did not discriminate against Mr. Aman by "failing" to provide a reasonable accommodation, *see Smith v. Midland Brake*, 180 F.3d 1154, 1159 (10th Cir. 1999)("the ADA defines the term 'discriminate' to include not making *reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee) (emphasis in original), because, as explained above, there was no reasonable accommodation it could have provided/available to provide.  Because a produce clerk, on his own steam, must be able to lift thirty pounds, it would not have been reasonable for

King Soopers to offer the accommodation of indefinite co-worker assistance.  Because an indefinite leave or a leave without any basis to believe that the leave will lead to an employee's recovery are unreasonable as matters of law, it would not have been reasonable for King Soopers to accommodate Mr. Aman by giving him additional leave. I GRANT summary judgment in favor of King Soopers on this claim.

3.   Mr. Aman Also Fails to Establish for His Reassignment a *prima facie* Case Of Retaliation or Discrimination Under Title VII, Section 1981, or the ADA.

To state a *prima facie* case for his retaliation claims, Mr. Aman must present evidence of a causal connection between his protected opposition and the materially adverse action to which he was subjected. *Twigg v. Hawker Beechcraft Corp.,* 659 F.3d 987, 998 (10th Cir. 2011) (Section 1981); *Daniels,* 701 F.3d at 638 (Title VII). "Protected opposition can range from filing formal charges to voicing informal complaints to superiors." *Fye v. Oklahoma Corp. Commission,* 516 F.3d 1217, 1218 (10th Cir.2008) *citing  Hertz v. Luzenac Am., Inc.,* 370 F.3d 1014, 1015 (10th Cir. 2004). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the [the statute]." *Hinds v. Sprint/United Management Co.,* 523 F.3d 1187, 1202-1203 (10th Cir. 2008.) Moreover, "[a] plaintiff need not convince the jury that his employer had actually discriminated against him; he need only show that when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory." *Hertz* at 1015; *Crumpacker v. Kansas Dep't of Human Res.,* 338 F.3d 1163, 1172 (10th Cir. 2003).  The good-faith belief must be,

however, both objectively and subjectively reasonable.  *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.1997)(explaining that a plaintiff must show "his belief was *objectively* reasonable in light of the facts and record presented"); *Espinoza v. Dept. of Corrs.*, 509 Fed.Appx. 724, 725 (10th Cir. 2013) (unpublished)(good-faith reasonable belief standard has "subjective and objective components").

Mr. Aman submits that he made a complaint of discrimination to Mr. Ruby in April of 2008[3] and that this constitutes protected activity.  Mr. Aman's declaration asserts that in April 2008 he complained to Mr. Ruby that Mr. Bateson would change his hours after he selected them and give them to a Hispanic employee with less seniority.  Ex. 44, ¶ 15.  He claims Mr. Bateson's actions were racially motivated.  *Id.* Mr. Aman's reliance on his declaration and its attendant evidence is insufficient, however, to show that he had an *objectively* reasonable belief that his reassignment was motivated by racial discrimination.  The system under which King Soopers' employees select their shifts and the deficiencies of Mr. Aman's supporting evidence both undercut a finding that Mr. Aman had an objectively reasonable belief that he was being discriminated against.

To begin, scheduling in the produce department is executed in accordance with a system called Select-A Shift, a collective bargaining agreement subjected to union review.  Ex. 1 at 123:5-7; Ex. 4 [Casados Dep] at 9:13-10:15; Ex. 1 at 124:16-18; Ex. 17 at KS1094.  When Mr. Aman submitted an earlier grievance to the union about his hours

---

[3] As discussed below, Mr. Aman and his declaration statement appear to use the incorrect year.  The evidence points to April 2007 as the date of Mr. Aman's complaints to Mr. Ruby.

in 2007, the union withdrew the grievance.  Ex. 17 at pp. 2-4. The Labor Relations review documents state that Mr. Aman did receive the most hours possible.  Ex. 17 at p. 5.  In notes from the grievance investigation, Santos Herrera, discussing his review of Mr. Aman's schedules, commented, "We have clearly showed that Mr. Aman was scheduled according to Select-A-Shift and did have appropriate hours. Grievance denied."  *Id.* at p. 6.  Moreover, when Mr. Aman had previously complained about the schedule, Teresa Smith, an African American Assistant Store Manager, explained scheduling to him and to the other produce clerks.  Ex. 1 at 121:22-122:9; Ex. 5 at 165:24-166:16; Ex. 15 at 23:24-25:20, 60:9-14 ; Ex. 9 at 58:19-60:18.  In an effort to temper the undisputed facts showing that he has a history of not understanding the scheduling system, Mr. Aman compares his 2008 hours report with that of Hispanic employee Eric Gonzales.

Mr. Aman does not, however, contend that he had access to this information or was even aware of it at the time he made his complaint.  If Mr. Aman did not have access to the information at the time of his complaint, it cannot form the basis of a reasonable complaint.  *Espinoza,* 509 Fed.Appx. at 731.  Even had Mr. Aman known the hourly breakdown for Mr. Gonzales at the time of his complaint, the comparison alone, without any other facts, does not provide reasonable support for a complaint.  For the weeks when Mr Gonzalez had more hours than Mr. Aman, it is perfectly plausible that Mr. Aman did not select all shifts available to him, *see* Ex. 19 ¶ M, and/or that Mr. Gonzales picked up shifts at other stores.  Although Mr. Aman need not know every detail about why Mr. Gonzalez had more hours than him at the time of his complaint, he must have known "at

least some facts that would support an objectively reasonable belief" that Mr. Gonzalez

had more hours than him because of discrimination. *Espinoza,* 509 Fed.Appx. at 731.

Even were I to find that Mr. Aman's belief was objectively reasonable, he has not

introduced evidence supporting a causal connection between his protected conduct and

his reassignment. Mr. Aman purports to rely on the "temporal proximity," *see Antonio v.*

*Sygma Network, Inc*., 458 F.3d 1177,1181-82 (10th Cir. 2006), between his complaints to

Mr. Ruby and his reassignment, arguing that Mr. Aman's reassignment occurred "less

than one month" from the time he voiced his complaints. Doc. 38 at p. 49. In so doing,

however, Mr. Aman uses misleading dates. Mr. Aman's declaration, which was not

executed until March 21st, 2013, contradicts without explanation his sworn Charge of

Discrimination in which he asserts that he reported the issue of his hours being cut and

given to other employees. Ex. 19 ¶ G; Ex. 70. Mr. Aman's Charge specifically

complains of both Mr. Bateson and Mr. Gordy harassing him and changing his hours. Ex.

19 ¶ H. Mr. Gordy no longer worked for King Soopers after May 9, 2007. Ex. 15 at

62:9-19; Ex. 9 at 53:13-58:4. Moreover, Mr. Aman expressly asserts in his Charge that

he filed a grievance over the issue. Ex. 19 ¶ I. Mr. Aman's grievance over this issue was

filed in April 2007. Ex. 17 at KS1094. The undisputed evidence, therefore, shows that

Mr. Aman's report of these issues to Mr. Ruby occurred, at the latest, in April 2007, not

April 2008. Protracted delays between protected opposition and the adverse action

suggest that the adverse action was not causally related to the protected opposition.

*Hysten v. Burlington N. & Santa Fe Ry. Co.,* 296 F.3d 1177, 1183-84 (10th Cir.2002)

(concluding that a period of "[a]lmost three months" between the protected activity and

the alleged retaliatory act does not permit an inference of causation); *Conroy v. Vilsack*, 707 F.3d 1163, 1165 (10th Cir. 2013) ("it is . . . patent that if the adverse action occurs three months out and beyond from the protected activity, then the action's timing alone will not be sufficient to establish the causation element").

Assuming arguendo that Mr. Aman has met his *prima facie* burden for the retaliation claims based on his reassignment, he has no persuasive evidence that King Soopers' offered reason for his reassignment—that he was unqualified for his position as a produce clerk because he had medical restrictions prohibiting him from meeting the position's requirement that he be able to lift 30 pounds—is pretext.  For example, Mr. Aman argues that his restrictions must have been pretext for discrimination because the service desk position 'also had a 30-pound lifting requirement.'" Doc. 38 at 49.  This statement, however, is simplistic, relying exclusively upon the written job description for the service desk position and placing that description above the reality of what a service desk clerk does.  Although a written job description is one piece of evidence Courts consider when determining what is an "essential function" of a position, it is hardly dispositive.  Courts also consider the amount of time spent on the job performing the function and the work experience of past incumbents in the job. 29 C.F.R. § 1630.2(n)(3); *see also Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000).  Further, the ADA requires me to consider "the employer's judgment as to what functions of a job are essential[.]" 42 U.S.C. § 12111(8).  Crucially, I may not "second guess the employer's judgment" regarding an essential function.  *Mason v. Avaya Comm., Inc*., 357 F.3d 1114, 1121 (10th Cir.2004).

King Soopers has cited manager testimony concerning the service desk clerk position. Ex. 7 at 31:5-35:25, 37:10-38:2. At Store No. 5, service desk clerks were not required to lift 30 pounds. *Id*. Mr. Aman has provided no contradictory testimony of any King Soopers' employee refuting the manager's testimony. Therefore, because King Soopers does not regard the ability to lift 30 pounds as an essential function of a service desk clerk at Store No. 5, I cannot regard the ability to lift 30 pounds as an essential function of the service desk clerk at Store No. 5. Mr. Aman may not rely exclusively on the written job description in the face of contradictory employer judgment where he has no other evidence of service desk clerks lifting 30 pounds.[4]

Mr. Aman also claims pretext because he "had been performing the duties of a produce clerk for over a year after his injury." Doc. 38 at 49. What he neglects to mention, however, is that he was performing the duties of a produce clerk only with an accommodation (the "buddy lift") that was not reasonable for the long term . Mr. Aman himself admitted that he could not perform the full duties of the position. Ex. 1 at 201:3-6. Mr. Aman's remaining arguments for the existence of pretext similarly misstate the evidence or are irrelevant. Because Mr. Aman cannot demonstrate pretext for the reassignment, his claims for racial discrimination and ADA retaliation must also fail. *See Daniels*, 701 F.3d at 627 (once the employer states a legitimate reason for an adverse employment action or a materially adverse action, Plaintiff bears the burden of showing

---

[4] Even if written job descriptions were dispositive, Mr. Aman has not proved that the written job description upon which he relies is specifically applicable to the service desk position. General merchandise clerks and service desk clerks share the same classification of "GG Clerk" for purposes of the written job description. *See* Ex. 7. General merchandise ("GM") clerks stock shelves and are therefore required to engage in regular lifting. *Id.* The job duties of both service desk clerks and GM clerks are listed under the written job description, but the job functions of each type of employee are not interchangeable. *Id.* GM clerks are never assigned to the service desk and vice versa. *Id.*

that the reason is a pretext for discrimination or retaliation.)  I GRANT summary

judgment in favor of King Soopers on this claim.

### B.  *Mr. Aman's Discharge Claims Move Forward, Excepting His ADA Discrimination Discharge Claim*

Mr. Aman's first and second claims for relief concern his discharge and are for

racial discrimination in violation of Title VII and 42 U.S.C. § 1981.  His fifth claim for

relief is that his discharge constitutes discrimination in violation of the Americans with

Disabilities Act. His seventh, eighth, and eleventh claims assert that his discharge was

retaliation in violation of Title VII, 42 U.S.C. § 1981, and the Americans with

Disabilities Act, respectively.  Here again, Mr. Aman must proceed under the burden-

shifting analysis of *McDonnell* because he has no direct evidence of discrimination.  As

with his reassignment discrimination ADA claim, he cannot make a *prima facie* claim

under the anti-discrimination provision of the ADA for his discharge, and I accordingly

GRANT summary judgment in King Soopers favor on this claim.  For Mr. Aman's

discharge-based Title VII, 42 U.S.C. § 1981, and ADA retaliation claims, his discharge-

based Title VII and 42 U.S.C. § 1981 claims concerning his race, and his public policy-

wrongful discharge claim, on the other hand, I find too many genuine disputes of material

fact preclude summary judgment and therefore DENY summary judgment.

### 1.  Mr. Aman Cannot Establish a Prima Facie Case of Discrimination Under the ADA

Mr. Aman's ADA discrimination discharge claim fails for the same reasons that

his ADA reassignment claims fail.  As stated above, Mr. Aman's permanent lifting

restrictions do not qualify as a disability under the ADA, and King Soopers' reliance on

Mr. Aman's medical report belies any suggestion that King Soopers improperly regarded

Mr. Aman as disabled. *See Rakity*, 302 F.3d at 1160; *Jones*, 502 F.3d at 1190 (discussing

reliance on medical evidence in the context of a claim for "regarded as" disability).

Furthermore, Mr. Aman has no *prima facie* claim for failure to accommodate at

the service desk position, because he did not need an accommodation to work at that

position.  As explained above, King Soopers presents evidence showing that while

produce clerks have to lift over thirty pounds daily, a service desk clerk only has to lift

over thirty pounds extremely rarely.   How often a service desk employee might be

required to lift a given weight is relevant to whether lifting the weight is an essential

duty. *Mason*, 357 F.3d at 1119.  Even were Mr. Aman to have needed a reasonable

accommodation, he has not met his "burden of coming forward with evidence concerning

his individual capabilities and suggestions for possible accommodations to rebut the

employer's evidence." *White v. York International Corp.,* 45 F.3d 357 (10th

Cir.1995)(quotations omitted).  There is no evidence that Mr. Aman ever requested an

accommodation of any kind related to the service desk position or suggested that one

might be necessary. *See Robertson v. Las Animas Cnty. Sheriff's Dept.,* 500 F.3d 1185,

1197 (10th Cir. 2007) (absent an obvious need for an accommodation, an employee must

request the accommodation to trigger the ADA's reasonable accommodation

requirement).  I GRANT summary judgment in favor of King Soopers on this claim.

### 2.   Mr. Aman Can Establish for his Discharge a Prima Facie Case of Retaliation Under Title VII and § 1981

For his Title VII and § 1981 retaliation claims based on discharge, Mr. Aman relies not upon his complaints to Mr. Ruby, but upon his May 2008 complaints to Ms. Clarke. Unlike his Title VII and § 1981 retaliation claims based on the complaints to Mr. Ruby and his reassignment, Mr. Aman can demonstrate a causal connection between the complaints to Ms. Clarke and the adverse employment action of his discharge.

After being reassigned to the service desk, and after unsuccessfully requesting a leave of absence in connection therewith, Mr. Aman called Ms. Clarke on May 5, 2008. Ex. 28. Mr. Aman asked her why he was not allowed to take leave, and Ms. Clarke explained to him that leave was not an available option because his Job Assessment indicated that there was a job he could perform. *Id*. Mr. Aman told Ms. Clarke that he believed he had been discriminated against and harassed throughout his employment history. *Id*. He reported being called names, including "monkey," and being referred to as "lazy." *Id.* These comments implicate protected activity.

As explained above, a causal connection can be inferred from temporal proximity. Here, Mr. Aman was terminated by Mr. Ruby on June 2, 2008. Therefore, approximately one month had elapsed between the protected activity and the adverse material employment action. I find this timetable supports an inference of a causal connection between the two.

Because I find Mr. Aman has made out a *prima facie* case for retaliatory discharge under Title VII and § 1981, King Soopers must "articulate a legitimate, nondiscriminatory reason for the decision which adversely affected the employee."

*Martin v. Nannie and the New Borns, Inc.*, 3 F.3d 1410, 1417 (10th Cir. 1993). King

Soopers contends that Mr. Ruby fired Mr. Aman because Mr. Aman had failed to work

his scheduled shifts at the service desk for a two-week period and his absences were

unexcused. I accept this reason as sufficiently legitimate to shift the burden back to Mr.

Aman, wherefore he must show that King Soopers' offered explanation is a pretext for an

illegal motive. *See Twigg,* 659 F.3d at 991, 995 (holding that the employer's decision to

terminate an employee for failing to comply with the employer's call-in policy and

failing to report to work constituted a legitimate reason for termination).

To show pretext, Mr. Aman must produce evidence showing weakness,

implausibility, inconsistency, incoherency, or contradiction in King Soopers' position.

*Daniels*, 701 F.3d at 639. Virtually the only undisputed fact Mr. Aman offers to show

pretext is the temporal proximity between Mr. Aman's discrimination complaint, which

coincided with his request for leave as an accommodation, and his discharge. This is

insufficient to show that King Soopers' reasons for termination were pretexual, however,

because the unexcused absences violated King Soopers' attendance policy and occurred

temporally between Mr. Aman's complaints to Ms. Clarke and his discharge. *Twigg*, 659

F.3d at 1001-02 ("evidence of temporal proximity has minimal probative value in a

retaliation case where intervening events between the employee's protected conduct and

the challenged employment action provide a legitimate basis for the employer's action").

Turning to my assessment of the disputed facts, I am particularly wary of usurping

the jury's role as trier of fact. *See, e.g., Townsend v. Lumbermens Mut. Cas. Co.*, 294

F.3d 1232 (10th Cir. 2002) ("a rational finder of fact could reasonably find the

defendant's explanation false and could infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose,"); *see also, EEOC v. Horizon Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000) (reversing the grant of summary judgment to the employer in a disparate treatment discrimination case where a reasonable jury could conclude that defendant's explanation for its actions was pretextual). I repeat what I stated in *Ziegler v. Inabata of America, Inc.*, 316 F.Supp.2d 908, 914-915 (D. Colo. 2004) concerning disputed facts:

> A trier of fact must resolve these disputed issues in order to determine if there is a viable claim for [wrongful discharge]. In my view, these questions are appropriately determined not by a trial judge on summary judgment, but by a jury whose primary function is to make determinations about people's conduct based on subjective standards. See generally, A. Miller, The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding our Day in Court and Jury Trial Commitments? 78 N.Y.U. Law. R. 982, 1132 (June 2003) (consideration of objective standards of "human behavior, reasonableness, and state of mind [are] matters historically considered at the core province of jurors"). In Professor Miller's words, a decision now that no reasonable juror could find that Ziegler was terminated for refusing to violate a patent "discount[s] (1) the importance of a jury's evaluation of witnesses, (2) the greater sensory impact on the trier of live testimony, and (3) the value of trial cross-examination based on a full presentation of the evidence." *Id*. at 1090.

Ziegler at 914-915.

Here, I find that there are too many genuine disputes of material fact for Mr. Aman to establish pretext. For example, the parties submit different rosters of acceptable persons Mr. Aman might have called other than Mr. Ruby to report his absences and request leave, and the parties quarrel whether other individuals were similarly situated to Mr.

Aman and treated differently.  From debating the very existence of certain letters and

phone calls to clashing over the interpretation and practice of King Soopers' internal

policies, the parties disagree on nearly every fact bearing on whether Mr. Ruby's

explanation is pretextual.  Ultimately, resolution of these issues involves consideration of

objective standards of human behavior, reasonableness, and state of mind and are

"matters historically considered at the core province of jurors." *Id.* (internal quotations

omitted).  Accordingly, I hold that summary judgment is unavailable to King Soopers on

this claim as well as on any other of Mr. Aman's discharge related claims for which he

successfully establishes his *prima facie* case.

### 3.   Mr. Aman Can Establish A *Prima Facie* Case for His ADA Retaliation Claim

Although Mr. Aman's May 5, 2008 complaints to Ms. Clarke do not contain fresh

allegations of racial discrimination such that his Title VII and Section 1981 *reassignment*

*related claims* pass muster, they are enough to support a *prima facie* ADA retaliation

claim concerning his discharge.  Unlike a claim for discrimination under the ADA, an

ADA retaliation claim does not require that a plaintiff show that he or she is "disabled"

within the meaning of the ADA. So long as a plaintiff has a good-faith belief that he has

been discriminated against on the basis of a disability, an ADA retaliation claim shares

the same criteria as Title VII and §1981 retaliation claims, namely that a plaintiff must

show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable

employee would have found the challenged action materially adverse, and (3) that a

causal connection existed between the protected activity and the materially adverse

action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2414-15 (2006)).

Here, Mr. Aman complained about not receiving his request for leave.  Ex. 28. That complaint is protected activity. Although Mr. Aman was not entitled to leave, he had an objectively reasonable belief that he was entitled to leave because Ms. Clarke had previously told him he would be eligible for additional leave.  Ex. 1 at 205:25-206:3.  No party disputes that termination is materially adverse. There is temporal proximity to support an inference of a causal connection, for the termination was twenty days after. Incorporating by reference the pretext discussion in Section B.2, I again decline to grant summary judgment in King Soopers' favor on this claim. I also note that, particular to the ADA pretext issue, Mr. Aman raises a collateral estoppel argument.

Specifically, Mr. Aman argues that the jury verdict in *Julie Jacobson v. King Soopers*, 10-cv-01944-LTB-BNB, another ADA case, estops King Soopers from contesting whether it made a good faith effort to adopt and enforce policies and procedures to prevent violations of the ADA.  Doc. 38 at 66.  King Soopers' good faith effort is relevant to whether punitive damages are recoverable. 42 U.S.C. §1981a(b); *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 545 (1999).  The Tenth Circuit has explained the offensive use of the doctrine of collateral estoppel as follows:

> When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). *Parklane Hosiery* sanctioned the offensive use of collateral estoppel, permitting a plaintiff to "foreclose the

defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." 439 U.S. at 326 n.4. Under *Parklane*, if the components of collateral estoppel are satisfied, its benefits of economizing judicial resources and lessening the burdens of relitigating identical issues already decided, would be afforded a non-mutual plaintiff provided defendant had previously had a full and fair opportunity to litigate the issue. Importantly, the decision to eliminate the mutuality requirement to permit the plaintiff such a windfall was placed within the trial court's "broad discretion." *Id*. at 331.

In this Circuit, application of collateral estoppel requires: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Dodge v. Cotter Corp.,* 203 F.3d 1190, 1198 (10th Cir. 2000).  Furthermore, both the facts and the law must be substantially the same for the doctrine to obtain. *Community Hosp. v. Sullivan*, 986 F.2d 357, 358 (10th Cir.1993).  *See, e.g., Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 599–601 (1948) (doctrine of collateral estoppel confined to instances where controlling facts and applicable legal principles remain unchanged).

Mr. Aman directs my attention to question 8 of the *Jacobsen* jury verdict, which asked the jury if it believed King Soopers had proven that it [King Soopers] made a good faith effort to adopt and enforce policies and procedures to prevent violations of the ADA. Ex. 58, question 8.  The jury answered "no;" it did not believe that King Soopers had proven it made a good faith effort to adopt and enforce policies and procedures to prevent violations of the ADA. *Id*.  The policies that were in force during the time period

of the *Jacobsen* case were the same policies that were in force in 2008. Ex. 55 at 19: – 21: 18.  Mr. Aman argues that these facts satisfy the criteria necessary for me to apply collateral estoppel here and that the jury determination in *Jacobsen* is "powerful" evidence of pretext in Mr. Aman's case.  Doc. 38 at 66.

I disagree on both counts.  First, collateral estoppel is unavailable because the good faith issue in *Jacobsen* is not "identical" to the one in the instant matter. Although the issues overlap insofar as they both concern ADA law, I cannot say that the controlling facts are similar enough to make the issues "identical."  For starters, while Ms. Jacobsen must obviously have introduced evidence to her jury that convinced them that the King Soopers' employees relevant to her case did not act in bad faith, Mr. Aman has produced no evidence to show that the King Soopers personnel implicated in *Jacobsen* are the same players involved here.  Second, regarding whether the *Jacobsen* jury determination is "powerful" evidence of pretext here, Mr. Aman does not explain how the company's efforts to adopt and enforce ADA policies influenced King Soopers' decision to discharge Mr. Aman.

To recap, I deny summary judgment in King Soopers' favor on Mr. Aman's ADA retaliation discharge claim and, in the event King Soopers is ultimately found by a jury to have violated the ADA, I decline Mr. Aman's invitation to estop King Soopers from arguing that it made a good faith effort to adopt and enforce policies and procedures to prevent violations of the ADA.

4.  <u>Mr. Aman Can Establish a Prima Facie Case of Race Discrimination Under Title VII and § 1981</u>

A plaintiff may establish a *prima facie* case of wrongful termination due to race discrimination by showing that: (1) he belongs to a protected class; (2) he was qualified for the job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. *Perry v. Woodward*, 199 F.3d 1126, 1139 - 1140 (10th Cir. 1999). Mr. Aman can establish the elements of a *prima facie* case as follows: (1) Plaintiff is Ethiopian, Black, Compl. ¶ 7; (2) King Soopers deemed him qualified for the Service Desk position, Ex. 5 at 37:19–38:16 (Mr. Ruby's recollection of Mr. Aman's reassignment), Ex. 6 at 59:3–60:23 (Ms. Bouknight's explanation that Mr. Aman qualified to work at the service desk despite his restrictions); (3) Mr. Aman was discharged from his Service Desk position, Compl. ¶ 77; (4) After Mr. Aman left, the Service Desk position was not eliminated and Mr. Aman was replaced. Ex. 54 at 40: 3 – 12; 52: 20 – 53: 8.

Once more incorporating by reference the pretext discussion in Section B.2, I once more decline to grant summary judgment in King Soopers' favor on this claim.

### 5. Mr. Aman's Discharge In Violation of Public Policy Claim May Proceed

Mr. Aman alleges that King Soopers discharged him, in violation of public policy, for pursuing a workers' compensation claim. Am. Compl. 12/20/2011. The Workmen's Compensation Act of Colorado, Colo.Rev.Stat. §§ 8–40–101 through 8–66–112, awards "an employee, who is injured in the course and scope of his employment, medical treatment and compensation for the temporary and permanent loss of income resulting from the employee's temporary or permanent disability." *Lathrop v. Entenmann's, Inc.,*

770 P.2d 1367, 1372 (Colo.App.1989) (citing *Cronk v. Intermountain Rural Elec. Ass'n*, 765 P.2d 619 (Colo.App.1988)); *see also Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 108 (Colo.1992) (citing *Lathrop* with approval). Employees have a statutory right to have their work-related injuries compensated by their employers. *Id*. An employer's retaliation against an employee for his exercise of this statutory right gives the employee a common law cause of action to recover resulting damages. *Lathrop*, 770 P.2d at 1373.

The elements of a public policy-based common law claim for retaliatory discharge due to an employee's exercise of workers' compensation rights are that:

(1) the employee was employed by the defendant;
(2) the defendant discharged the plaintiff; and
(3) the plaintiff was discharged for exercising a job-related right or privilege to which he was entitled.

*Id*. at 1372–73.

Mr. Aman satisfies prongs (1) and (2), but cannot demonstrate that King Soopers discharged him for his exercising of his workers' compensation rights. Mrs. Bouknight testified that as of May 2008 Mr. Aman's workers' compensation claim was "over." Ex. 55 at p. 137:17-23. Mr. Aman never presented King Soopers with any information suggesting he had experienced an aggravation of his original injury such that he would have a new workers' compensation claim. Indeed, both his MMI and IME stated substantially identical restrictions and characterized them as *permanent*. Ex. 5 (MME); Ex. 25 (IME). The IME was done March 18, 2008, five months after the MMI, and does not indicate that Mr. Aman's condition declined whatsoever in the period between assessments.   In other words, Mr. Aman has not presented any evidence that he had any

workers' compensation rights to claim that he had not already claimed before being discharged.  Furthermore, there is no evidence that any King Soopers' employee thought that Mr. Aman was exercising his workers' compensation rights when he failed to come in for his scheduled shifts.  I GRANT summary judgment in favor of King Soopers on this claim.

### C.  Hostile Work Environment Discussion

To establish a claim for hostile work environment, Mr. Aman must show that there was a hostile environment at King Soopers that was sufficiently severe or pervasive to alter the conditions of his employment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Evaluation of whether the hostility is severe or pervasive is "quintessentially a question of fact." *O'Shea v. Yellow Tech. Serv's*, 185 F.3d 1093, 1098 (10th Cir. 1999)(citations omitted).

Whether a work environment is hostile is not a mathematical calculation; in some cases, a single incident of threatening conduct may be sufficient. *Lockard v. Pizza Hut, Inc*. 162 F.3d 1062, 1071-72 (10th Cir. 1998).  In analyzing a hostile work environment claim, a court must consider the totality of the circumstances, examining the record as a whole.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (20020; *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 – 87 (10th Cir. 2007).  Mr. Aman argues that the racial discrimination he experienced at King Soopers was sufficiently severe or pervasive that his employment was harmfully altered.  In support of this claim, Mr. Aman recites multiple events.

The events include, *inter alia*, (1) produce manager Don Gordy's injuring Mr. Aman in May 2007, Doc. 36 at p. 40; (2) instances of Mr. Aman being called racial derogatory names like "African monkey" in 2005 and before May 2007, *id.*; (3) King Soopers refusing to take action when Mr. Aman complained about the harassment or discrimination, *id.*; (4) King Soopers denying him time off for religious observances in 2006, *id.*; (5) Mr. Ruby and Mr. Bateson mocking his injury when he returned to work in June 2007, *id.*; (6) King Soopers maintaining that it sent Mr. Aman a letter dated May 20, 2008 when Mr. Aman claims it did not, Doc. 39 at p. 59; (7) King Soopers claiming it called Mr. Aman when Mr. Aman claims it did not, *id.*; and (8) Mr. Aman's belief that King Soopers imposed different standards on him than on others for calling in sick/taking sick leave, *id.*

### i. Timeliness

King Soopers counters by first contending that any hostile environment claim is time barred because events (1)-(5) that Mr. Aman recites to support his hostile work environment claim occurred outside of the applicable statutory time limits.[5] I disagree. Although events (1)-(5) did occur outside of the 300 day filing time period, events (6)-(8) occurred within 300 days of his filing a Charge of Discrimination.  The timely filing provision only requires that a Title VII or ADA plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of

---

[5] For a hostile work environment claim grounded in Title VII or the ADA, the 300 day filing time period of 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1), which here would be a deadline of May 17, 2008, applies.  Hostile work environment claims under § 1981 are subject to a four year statute of limitations. *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1152-53 (10th Cir. 2008). Here, the limitation begins from the time the lawsuit, not the Charge of Discrimination, was filed extends back to November 15, 2007. *See* Doc. 1 [filed November 15, 2011].)

the statute, that some of the component acts of the hostile work environment fall outside

the statutory time period. Provided that an act contributing to the claim occurs within the

filing period, the entire time period of the hostile environment may be considered by a

court for the purposes of determining liability. *Nat'l R.R. Passenger Corp. v. Morgan*,

356 U.S. 101, 117 (202).  King Soopers also relies upon *Nat'l R.R. Passenger Corp*, but

King Soopers completely misstates the holding and conflates (to its advantage, of course)

claims regarding specific discrete acts and claims specifically for a hostile work

environment.

King Soopers urges me to rule that events (6)-(8) did not contribute to Mr. Aman's

allegedly hostile work environment and that the events are therefore unconnected acts

that may not be combined with the earlier allegedly harassing conduct.  I reject King

Soopers' request to draw such an inference in its favor (not least because King Soopers is

the moving party, and facts on summary judgment are viewed in the light most favorable

to the non-moving party, *Simms v. Okla. ex rel. Dep't of Mental Health & Substance*

*Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir.1999), however, and believe a jury should

decide whether the conduct is related.  For example, events both before and after May 17,

2008 deal with the question of whether King Soopers treated Mr. Aman differently from

others because of his race. Specifically, Mr. Aman's claim that King Soopers refused to

take action when he complained about harassment or discrimination predates May 17,

2008 and his claim that Mr. Ruby applied different standards regarding calling in and

sick leave to him because of his race comes both before and after May 17, 2008.  King

Soopers says a failure to investigate is not adverse action, but that proposition, cited from

*Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir.2012), is irrelevant. There was no hostile work environment claim in *Daniels*.  That a failure to investigate is not an adverse action is pertinent only to claims having the element of an employee suffering adverse employment action.  No "adverse employment action" is required for a hostile workplace environment claim.  Here, a failure to investigate discriminatory conduct may have altered Mr. Aman's environment in the sense that discrimination was allowed to continue and intensify.  Insofar as Mr. Aman's hostile work environment claim stems from alleged Title VII, ADA, and/or § 1981 violations, I conclude that a reasonable jury could find all or enough of the events alleged in support of the claim to be connected such that the claim will not fail on summary judgment for lack of timeliness.

      ii. <u>Mr. Aman Has Stated An Actionable Hostile Work Environment Claim</u>

      Regardless of whether Mr. Aman's hostile work environment claim is grounded in Title VII, the ADA, or § 1981, he must present sufficient evidence that the alleged conduct, considered in the totality of the circumstances, was because of a characteristic protected by the applicable law, and was pervasive or severe enough to alter the terms, conditions or privileges of employment.  *Morris v. City of Colorado Springs*, 666 F.3d 654, 658 (10th Cir. 2012) (applying the standard to Title VII); *Witt v. Roadway Express*, 136 F.3d 142, 1428 (10th Cir. 1998) (applying same to 42 U.S.C. § 1981); *Thomas v. Avis Rent A Car*, 408 Fed.Appx. 145, 147 (10th Cir. 2011) (applying same to ADA).  To be actionable, conduct must be both objectively and subjectively hostile or abusive. *Morris*, 666 F.3d at 664.

King Soopers makes two fundamental objections to the sufficiency of Mr. Aman's evidence.  First, King Soopers more or less repeats its argument regarding timeliness to argue that the events alleged by Mr. Aman are simply too unrelated or too isolated to constitute a work environment that was pervasively or severely hostile.  Second, King Soopers contends Mr. Aman cannot show discriminatory motivation for the events alleged.

"A plaintiff does not make a sufficient showing of a pervasively hostile work environment "by demonstrating a few isolated incidents of ... sporadic ... slurs.... Instead, there must be a steady barrage of opprobrious ... comments." *Morris*, 666 F.3d at 666 (quoting *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir.1994)(internal quotation marks omitted)).  Moreover, Title VII, though it does prohibit racial discrimination, "does not set forth a general civility code for the American workplace." *Burlington N. Santa Fe Ry. Co.*, 548 U.S. at 68 (quotations omitted).

On the other hand, the more despicable the comments, the less pervasiveness is required.  The incident with Mr. Gordy may be enough on its own.  *See Lockard v. Pizza Hut, Inc.* 162 F.3d at 1072 (holding that a single incident of physically threatening conduct can create an abusive environment contrary to law).  Although Mr. Aman does not present facts as extreme as some successful plaintiffs have, *see Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1152-53 (10th Cir. 2008), it is well within the realms of reason and law to say that the question of whether King Soopers' conduct was sufficiently severe or pervasive to the point of altering Mr. Aman's work environment is best determined by a jury.

CONCLUSION

For the foregoing reasons, King Soopers' Motion for Summary Judgment, Doc. 25 is GRANTED in regard to

1. Mr. Aman's Third and Fourth Claims (racial discrimination based on reassignment per Title VII and 42 U.S.C. § 1981(a));

2. Mr. Aman's Fifth Claim (discrimination violation of the ADA based on discharge)

3. Mr. Aman's Sixth Claim (violation of the ADA based on reassignment)

4. Mr. Aman's Ninth and Tenth Claims (retaliation claims under Title VII and 42 U.S.C. § 1981(a) based on reassignment);

and is DENIED in regard to

5. Mr. Aman's First and Second Claim (racial discrimination based on discharge per Title VII and 42 U.S.C. § 1981(a) );

6. Mr. Aman's Seventh and Eight Claims (discharge-based retaliation per Title VII and 42 U.S.C. § 1981(a);

7. Mr. Aman's Eleventh Claim (retaliation under the ADA based on discharge)

8. Mr. Aman's Twelfth Claim (hostile work environment); and

9. Mr. Aman's Thirteenth Claim (wrongful discharge in violation of public policy).

DATED:       March 11, 2014                    BY THE COURT:

_**s/John L. Kane**_
John L. Kane, U.S. Senior District Judge